**DAWN EQUIPMENT COMPANY,**
Plaintiff–Appellee,

v.

**KENTUCKY FARMS INCORPORATED,**
Defendant–Appellant.

No. 97–1042.

United States Court of Appeals,
Federal Circuit.

March 24, 1998.

Stephen G. Rudisill, Arnold, White & Durkee, Chicago, IL, argued for plaintiff-appellee. On the brief was Edward L. Foote, Winston & Strawn, Chicago, IL.

Keith V. Rockey, Rockey, Milnamow & Katz, Ltd., Chicago, IL, argued for defendant-appellant. On the brief was Kathleen A. Lyons.

Before NEWMAN, MICHEL, and PLAGER, Circuit Judges.

Opinion for the court filed by Circuit Judge PLAGER. Additional views filed by Circuit Judges PLAGER, NEWMAN, and MICHEL.

PLAGER, Circuit Judge.

In this patent infringement case, the jury determined that the accused device, although not literally infringing, infringed under the doctrine of equivalents. The trial judge gave judgment accordingly, and denied defendant's motion for judgment as a matter of law ("JMOL"). Because on these facts no reasonable jury could have found infringement, we reverse the denial of defendant's motion for JMOL and order judgment for the defendant.

## BACKGROUND

Plaintiff Dawn Equipment Company ("Dawn Equipment") sued defendant Kentucky Farms Incorporated ("Kentucky Farms") for infringement of U.S. Patent No. 5,129,282 ("'282 patent"), entitled "Mechanism for Selectively Repositioning a Farm Implement." Shortly before holding a jury trial, the trial judge held a *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 975–76, 34 USPQ2d 1321, 1325–26 (Fed.Cir. 1995) hearing to construe the only asserted patent claim. The trial judge instructed the jury on his claim construction and thereafter submitted the issues of literal infringement and infringement under the doctrine of equivalents to the jury. The issues were submitted by way of two special interrogatories that asked the jury to answer with a simple yes or no whether there was literal infringement and whether there was infringement under the doctrine of equivalents. The jury returned its verdict, answering "no" to literal infringement and "yes" to infringement under the doctrine of equivalents. Kentucky Farms filed a motion for JMOL on the doctrine of equivalents infringement verdict. The trial judge denied the motion, and this appeal followed.

The '282 patent discloses a device for adjusting the height of a farm implement such as a row cleaning device. A row cleaning device, which frequently consists of a pair of wheels having sharp teeth, is often attached to a planter to clear residue from the planter's path. In pointing out problems in the prior art, the '282 patent describes prior art "multi-hole pinned height adjustment" mechanisms. '282 patent, col. 1, l. 55, to col. 2, l. 29. The patent explains that raising or lowering such prior art mechanisms can be very time-consuming, tedious, and repetitive. Adjusting the height of such mechanisms requires the operator to manually elevate and shift the farm implement to align holes and insert pins. The patent also explains that the loose pins used in the prior art mechanisms are easily lost. Moreover, when adjusting the height of such a prior art mechanism, the operator is required to place himself beneath the farm implement, which increases the risk of accidents and injuries.

The '282 patent explains that these problems are avoided by using an improved mechanism, illustrated in Figures 1 and 2 of the patent, reproduced below.

FIG. 1

FIG. 2

Figure 1 shows the height adjusting mechanism in the lowered position; Figure 2 shows the same device in the raised position. The device includes a control/locking means 46 for alternating the implement between the raised and lowered positions. The control/locking means includes a handle 48, cylindrical rods 50 and 56, a cylindrical shaft 52, and a transverse pin 54 carried on the cylindrical shaft 52. A spring 68 biases the mechanism in the raised position, as shown in Figure 2. In the lowered position, the pin 54 is engaged in the slot 72, against the bias of the spring 68. To move the implement from the lowered position to the raised position, the operator presses down on and turns the handle 48 to rotate the pin 54 out of the slot 72. The spring 68 then overcomes the weight of the farm implement and pushes the implement into the raised position. The patent explains that this operation can be performed safely and quickly from above the farm implement.

Claim 9 of the patent, the only claim at issue, provides (emphasis added):

A mechanism for adjusting the height of a farm implement/tool of the type to be carried by a drawing vehicle, said adjusting mechanism comprising:

a connecting means for supporting a farm implement/tool in an operative position;

means for guiding sliding movement of the connecting means selectively between first and second positions corresponding to raised and lowered positions for a farm implement/tool carried by the connecting means;

means for mounting the guiding means to one of a drawing vehicle and a support to be carried by a drawing vehicle;

*means for locking the connecting means in one of the first and second positions and for selectively releasing the connecting means to allow the connecting means to be slid into the other of the first and second positions therefor;*

means for limiting sliding movement of the connecting means with the connecting means released; and

means for normally spring biasing the connecting means to one of the first and second positions therefor.

The accused Kentucky Farms device, illustrated below, includes a connecting bar 10, which telescopes within a rectangular sleeve 12.

A row cleaning device, or other farm implement, is attached to the connecting bar 10 at a pair of axes 14. The sleeve 12 is bolted onto a mounting bracket 16, which is attached to a planter. The connecting bar 10 is inserted in sleeve 12, and a bolt 20 is inserted in the uppermost opening in the connecting bar 10, to prevent the connecting bar from slipping down through the sleeve 12. A spring 22, attached at its upper end to the sleeve 12, and at its lower end to the connecting bar 10, supports a portion of the weight of the connecting bar and attached row cleaning device.

The Kentucky Farms device has a multiple-hole, pinned height adjustment mechanism. In that mechanism, a removable angled pin 30 is used to secure the connecting

bar 10 within the sleeve 12 at a desired height, thereby setting the height of the attached row cleaning device. In particular, the connecting bar 10 is adjusted to the desired height, and then the pin 30 is inserted through one set of holes 26 in the sleeve and one set of holes 28 in the connecting bar. A retaining clip (not shown in the above diagram) is then placed through a hole in the straight end of the pin 30, to prevent the pin 30 from sliding out. The retaining clip must first be removed before the height can be readjusted.

On appeal, Kentucky Farms contends that the trial judge erred by construing claim 9 too broadly. However, Kentucky Farms contends that, even under the trial judge's claim construction, the jury verdict of infringement under the doctrine of equivalents cannot stand, and that the trial judge therefore erred in not granting Kentucky Farms' motion for JMOL. In the alternative, Kentucky Farms asserts that, in the event we do not order judgment in its favor, it is entitled to a new trial in view of the alleged erroneous claim construction. Dawn Equipment, in response, argues that the trial judge properly construed claim 9 and that the jury's verdict is supported by substantial evidence and therefore should not be disturbed.

## DISCUSSION

### 1.

■ In reviewing the trial judge's denial of Kentucky Farms' motion for JMOL, we keep in mind our standard of review, which is the same standard that was applicable at the trial court level. *See Texas Instruments Inc. v. Cypress Semiconductor Corp.*, 90 F.3d 1558, 1563, 39 USPQ2d 1492, 1496 (Fed.Cir. 1996) (noting that a district court's JMOL ruling is reviewed by reapplying JMOL standard), *cert. denied*, —— U.S. ——, 117 S.Ct. 1818, 137 L.Ed.2d 1027 (1997). Legal standards given to the jury are reviewed without deference to the trial court, whereas the jury's resolution of factual disputes are reviewed to determine whether there is sub-

stantial evidence to support them. *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 975–76, 34 USPQ2d 1321, 1325–26 (Fed.Cir.1995) (in banc), *aff'd*, 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577, 38 USPQ2d 1461 (1996). In reviewing factual issues for substantial evidence, the inquiry is whether a reasonable jury, given the record before it viewed as a whole, could have arrived at the conclusion it did. *See Texas Instruments*, 90 F.3d at 1563, 39 USPQ2d at 1496.

### 2.

■ It is standard doctrine that determining infringement is a two-step process. *See id.*, 39 USPQ2d at 1497. First, the court must construe the asserted claims as a matter of law to ascertain their meaning and scope. *See id.* Second, the claims as construed are compared to the allegedly infringing device. *See id.* To infringe a claim, each claim limitation must be present in the accused product, literally or equivalently. *See Sofamor Danek Group, Inc. v. DePuy-Motech, Inc.*, 74 F.3d 1216, 1220, 37 USPQ2d 1529, 1531 (Fed.Cir.1996). Thus, the construction of each claim limitation is crucial to the infringement determination.

We begin with the first step, claim construction. The pertinent claim limitation here is the means for locking and releasing, recited specifically as:

> means for locking the connecting means in one of the first and second positions and for selectively releasing the connecting means to allow the connecting means to be slid into the other of the first and second positions therefor;

'282 patent, col. 6, ll. 56–60. As the parties agree, this limitation is a so-called means-plus-function claim limitation drafted pursuant to 35 U.S.C. § 112, ¶ 6 (1994).[1] Section 112, ¶ 6 specifies that such limitations "shall be construed to cover the corresponding structure ... described in the specification and equivalents thereof." Here, the most closely corresponding structure described in the specification (that is, in the written de-

---

1. The statute refers to a claim "element," but this court has moved towards the custom of referring to claim "limitations," reserving the word "elements" for describing the parts of the accused device, though the court on occasion continues to use the words interchangeably. *See, e.g., Sofamor*, 74 F.3d at 1220, 37 USPQ2d at 1531 (referring to "body attaching means" interchangeably as a § 112, ¶ 6 means element and means limitation). Herein we refer to claim limitations.

scription) is the control/locking means 46, described as:

> A control/locking means 46 for selectively raising and lowering the implement/tool 8 includes an external handle 48, a first cylindrical rod 50, a cylindrical base portion 52 including a transverse pin 54, and a second cylindrical rod 56 coaxial with the rod 50.

*Id.* at col. 4, ll. 45–49. The patent goes on to explain that "[t]he handle 48 of the locking means 46 is used to selectively rotate the . . . pin 54 into and out of [the] slot 72." *Id.* at col. 5, ll. 2–5. The patent illustrates this structure in Figures 1 and 2 (included above).

As a matter of claim construction, the trial judge identified the rotatable shaft 52, the pin 54, and the slot 72 as the structure corresponding to the means for locking and releasing, and accordingly instructed the jury:

> The second [claim clause at issue] is [the] means for locking the connecting [means] in one of the first and second positions and for selectively releasing the connecting means to allow the connecting means to be slid into the other of the first and second positions therefor. The court has determined that the structure described in the patent for performing this function is the rotatable shaft 52, the pin 54, and the slot 72 with which the pin is moved in and out of engagement, the slot being in the bracket 24 to lock the movable connecting stem assembly 30 to the fixed guide bracket 24 in the raised or lowered position. This structure is shown in Figures 1, 2, and 3 of the '282 patent.

According to Kentucky Farms, the trial judge was correct in identifying the rotatable shaft 52, the pin 54, and the slot 72 as part of the described structure corresponding to the locking and releasing means, but erred by not also including the handle 48. Dawn Equipment, on the other hand, asserts that the trial judge got the claim construction right. Thus, the only claim construction issue raised by the parties is whether the corresponding structure includes the handle 48.

We need not resolve this issue of claim construction because viewing the corresponding structure as including the rotatable shaft 52, pin 54, and slot 72—to which neither party objects and with which we detect no error—is sufficient to resolve the ultimate infringement issue. As we shall now explain, even construing the corresponding structure as including only the rotatable shaft, pin and slot, Kentucky Farms' device does not infringe because, under this claim construction, Kentucky Farms' device, though it performs the specified locking and releasing function, does not include equivalent structure. Further including the handle 48 as part of the corresponding structure, which appears reasonable, would only provide another reason for noninfringement.

### 3.

■ Having addressed claim construction, we proceed to the second step, application of the construed claim to the accused device. Given the jury's verdict and the form of appeal, we are presented only with the issue of infringement under the doctrine of equivalents.[2] As recently made clear by the Supreme Court in its *Warner–Jenkinson* opinion, infringement under the doctrine of equivalents must be established on a limitation-by-limitation basis. *See Warner–Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, ——, 117 S.Ct. 1040, 1049, 137 L.Ed.2d 146, 41 USPQ2d 1865, 1871 (1997). Thus, to establish infringement under the doctrine of equivalents, the accused device must be shown to include an equivalent for each literally absent claim limitation.

■ To determine equivalence under the doctrine of equivalents, this court applies the "insubstantial differences" test, recognizing the admitted short-comings of that test. See, for example, the Supreme Court's critical assessment of that test in *Warner–Jenkinson:* "the insubstantial differences test offers little additional guidance as to what

---

2. For purposes of our discussion, and because neither party addresses the point, we shall assume that it is legally proper to apply the doctrine of equivalents to a claim drafted in means-plus-function form. (But see the additional views of Judges Plager, Newman, and Michel, *infra.*)

might render any given difference 'insubstantial.'" *Id.* at ——, 117 S.Ct. at 1054, 41 USPQ2d at 1875. In appropriate cases the function-way-result test, discussed at length in *Hilton Davis Chemical Co. v. Warner–Jenkinson Co.*, 62 F.3d 1512, 1518, 35 USPQ2d 1641, 1645 (Fed.Cir.1995) (in banc), *rev'd on other grounds,* 520 U.S. 17, 117 S.Ct. 1040, 137 L.Ed.2d 146, 41 USPQ2d 1865 (1997), offers additional guidance on the question of equivalence.

■ Under the function-way-result test, one considers whether the element of the accused device at issue performs substantially the same function, in substantially the same way, to achieve substantially the same result, as the limitation at issue in the claim. *See id.* In *Warner–Jenkinson* the Supreme Court observed that this test "may be suitable for analyzing mechanical inventions." 520 U.S. at ——, 117 S.Ct. at 1054, 137 L.Ed.2d 146, 41 USPQ2d at 1875. We have such an invention here, and the jury was instructed on this test as well as the insubstantial differences test.[3] Accordingly, we also consider the function-way-result test, and find it somewhat helpful.

■ With the legal background set, we now consider the issue presented by the parties: does Kentucky Farms' device include an equivalent to the claimed locking and releasing means, such that Kentucky Farms satisfies the means-plus-function limitation under the doctrine of equivalents ? Dawn Equipment in essence asserts that the multiple-hole, pinned height-adjustment mechanism in Kentucky Farms' device is equivalent to the structure set forth in the patent. As already described, the multiple-hole, pinned height-adjustment mechanism in Kentucky Farms' device includes a loose angled pin 30 and two sets of holes 26 and 28. Thus, based on the above claim construction, the issue of infringement under the doctrine of equivalents is, in the vernacular of the function-way-result test, whether the loose pin and holes combination in Kentucky Farms' device

performs substantially the same function, in substantially the same way, to achieve substantially the same result as the rotatable shaft, pin and slot mechanism shown in Figures 1 and 2 of the '282 patent. We reach the obvious conclusion that, applying this test, no reasonable jury could have found infringement under the doctrine of equivalents.

While the functions of the two mechanisms are the same (i.e., locking and releasing a connecting member), the way and result are not substantially the same. The mechanisms are structurally quite different, and operate quite differently. In the patented device, the pin 54 is permanently fixed to the rotatable shaft 52 and is locked into and released from engagement with the slot 72 by rotating the shaft 52. In sharp contrast, in Kentucky Farms' device, the pin 30 is not attached to anything and is inserted in and removed from the holes 26 and 28 by hand.

There is damning evidence within the text of the '282 patent itself that the two mechanisms do not operate in substantially the same way. Specifically, the patent strongly suggests, if not teaches, that they are not equivalent. The '282 patent, in its Background of the Invention section, describes the problems with prior art "multi-hole pinned height adjustment" mechanisms. The patent teaches that such mechanisms are time-consuming to adjust and are prone to misadjustment by inserting the pin in the wrong holes, and furthermore the loose pins in such mechanisms are easily lost. '282 patent, col. 2, ll. 12–29. Kentucky Farms' multiple-hole, pinned height-adjustment mechanism is such a mechanism and shares these same problems. In contrast, the '282 patent teaches that the mechanism provided by the patented invention is directed at solving these problems. *Id.* at col. 2, ll. 31–34. These statements in the patent alone strongly suggest, if not mandate, judgment in Kentucky Farms' favor. *See Sofamor,* 74 F.3d at 1220, 37 USPQ2d at 1531–32 (resorting to the description in the patent specification of dis-

---

**3.** The application of these tests ordinarily is treated as a question of fact, one for the jury in cases so tried. *See Hilton Davis,* 62 F.3d at 1520–22, 35 USPQ2d at 1647–48 (stating that infringement under the doctrine of equivalents is

a question of fact for the jury in a jury trial); *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.,* 339 U.S. 605, 609, 70 S.Ct. 854, 857, 94 L.Ed. 1097 (1950) ("A finding of equivalence is a determination of fact.").

advantages of the prior art in evaluating equivalence).

Furthermore, consistent with these statements in the patent, Dawn Equipment was unable to provide sufficient evidence that the Kentucky Farms' loose pin and holes mechanism operates in substantially the same way as the rotatable shaft, pin and slot mechanism disclosed in the patent. Indeed, while Dawn Equipment presented substantial expert testimony on infringement, the experts, in testifying with regard to these two mechanisms, merely compared the pins in the two mechanisms. The experts testified that the mechanisms were similar because they both had pins, and opined that the sliding versus rotating motions of the pins in the two mechanisms were simply common alternatives. Most notably, the experts made no reference to the rotatable shaft 52 in the mechanism disclosed in the '282 patent. In essence, the experts opined that the two mechanisms were equivalent because they both used pins and because sliding versus rotating the respective pins was, in their opinions, a common alternative.

Mere comparison of the pins is insufficient to establish that the devices operate in substantially the same way. As the jury was instructed, the relevant structure disclosed in the '282 patent included at least the rotatable shaft, pin and slot—not merely a pin. The testimony by Dawn Equipment's experts fails to establish that Kentucky Farm's loose pin and holes combination is equivalent to the rotatable shaft, pin and slot mechanism, particularly in view of the contrary statements in the '282 patent. *See Texas Instruments,* 90 F.3d at 1567–68, 39 USPQ2d at 1500 (holding that conclusory expert testimony as to the overall similarity of a claim limitation and the alleged corresponding element in the accused product was insufficient to establish equivalence under the doctrine of equivalents).

With regard to the result, Kentucky Farms' loose pin and holes combination does not accomplish substantially the same results provided by the rotatable shaft, pin and slot mechanism disclosed in the '282 patent. In particular, the patent touts that the invention reduces adjustment time, prevents misadjustment and eliminates the problem of easily lost pins. The disclosed shaft, pin and slot mechanism plays a major role in achieving these results. Because the mechanism is easy and quick to operate, adjustment time is reduced, and because the mechanism only allows for two positions (lowered and raised), misadjustment is prevented. *See* '282 patent, col. 2, ll. 58–61, col. 3, ll. 5–9, 32–34. Furthermore, because the pin is fixed to the rotatable shaft, the pin cannot be lost. In sharp contrast, Kentucky Farms' loose pin and holes combination accomplishes none of these touted results. As the patent describes, a loose pin and holes mechanism is time consuming to adjust, is prone to misadjustment because of the multiple holes, and the loose pin is easily lost. *Id.* at col. 2, ll. 12–28.

Accordingly, viewing the record as a whole, the jury's verdict of infringement under the doctrine of equivalents is not supported by substantial evidence. No reasonable jury could have found infringement under the doctrine of equivalents.

■ In *Warner–Jenkinson,* the Supreme Court urged district courts in appropriate circumstances to give serious consideration to directing judgment (e.g., in response to a motion for summary judgment or JMOL) on the issue of equivalence under the doctrine of equivalents, and in fact stated that district courts "are obliged" to do so "[w]here the evidence is such that no reasonable jury could determine two elements to be equivalent." 520 U.S. at —— n. 8, 117 S.Ct. at 1053 n. 8, 137 L.Ed.2d 146, 41 USPQ2d at 1875 n. 8. The Court recognized that there may be "a reluctance to do so by some courts" and encouraged this court to remedy the problem. *Id.* In this vein, we note that while infringement under the doctrine of equivalents is generally considered a question of fact, that does not in and of itself preclude directing judgment in favor of the accused infringer. There is a triable issue of fact only if the evidence is such that a reasonable jury could resolve the question in favor of the patentee. *See id.* In this case, no reasonable jury could have found equivalence. It accordingly was error not to order judgment in favor of Kentucky Farms.

## CONCLUSION

The judgment denying the defendant's motion for JMOL is reversed; judgment for the defendant is ordered.

*REVERSED.*

PLAGER, Circuit Judge, additional views.

I write additionally because I find the law in this area confused and confusing. The limitations in the claim at issue are drawn in means-plus-function form pursuant to 35 U.S.C. § 112, ¶ 6 (1994). Section 112, paragraph 6 provides that such limitations [1] "may be expressed as a means ... for performing a specified function without the recital of structure, material, or acts in support thereof...." When so expressed, "such claim [limitations] shall be construed to cover the corresponding structure, material, or acts described in the specification *and equivalents thereof.*" 35 U.S.C. § 112, ¶ 6 (emphasis added).

It is established law that, when an accused product satisfies such claim limitations by way of structure *equivalent* to that described in the specification (and otherwise satisfies the requirements for infringement), the infringement is deemed *literal* infringement. *See, e.g., P.M. Palumbo v. Don–Joy Co.,* 762 F.2d 969, 975 n. 4, 226 USPQ 5, 8 n. 4 (Fed.Cir.1985) (noting that use of an "equivalent" under § 112, ¶ 6 leads to literal infringement rather than infringement under the doctrine of equivalents). Thus, with regard to claim limitations drawn pursuant to § 112, ¶ 6, the notion of literal infringement, as distinct from infringement under the doctrine of equivalents, includes equivalents.

What place then is there for the doctrine of equivalents with regard to such claim limitations? Opinions of this court have attempted to draw a distinction between what is meant by an equivalent under § 112, ¶ 6, and what is meant by an equivalent under the doctrine of equivalents. The implicit assumption is that, as a matter of law, a patentee with a § 112, ¶ 6 claim has a choice of alleging infringement under either or both,

and the trier of fact is free to find that the accused product does not infringe under the one kind of equivalent, but does under the other.

One problem with this approach is that it assumes that there are clearly defined operational differences between these two notions of equivalents, and that triers of fact (usually, whether judge or jury, persons unfamiliar in the first instance with the technology at issue, much less the legal conceptualizations) can readily differentiate between them. Two cases from this court in recent years have spoken to the distinctions between the two types of equivalents, and have attempted to draw out the character of these differences: *Valmont Industries., Inc. v. Reinke Manufacturing Co.,* 983 F.2d 1039, 1041–44, 25 USPQ2d 1451, 1453–55 (Fed.Cir.1993); and *Alpex Computer Corp. v. Nintendo Co.,* 102 F.3d 1214, 1222, 40 USPQ2d 1667, 1673–74 (Fed.Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 2480, 138 L.Ed.2d 989 (1997).

The cases cast the differences in terms of separate origins and purposes, and that the different equivalents have different "application." *Valmont,* 983 F.2d at 1043–44, 25 USPQ2d at 1454; *Alpex,* 102 F.3d at 1222, 40 USPQ2d at 1673. On the other hand, they are in agreement that the term "equivalent" in both statute and doctrine, to employ the phrase used in *Valmont,* "invokes the familiar concept of an insubstantial change which adds nothing of significance." *Valmont,* 983 F.2d at 1043, 25 USPQ2d at 1455; *see also Alpex,* 102 F.3d at 1222, 40 USPQ2d at 1673–74. This suggests at the least that the tests for equivalence under the statute and the doctrine are quite similar, if not the same.

The *Valmont* and *Alpex* courts attempt to distinguish the tests on several grounds. The *Alpex* court opines that under the statute the accused product is compared to the structure disclosed in the specification corresponding to the means-plus-function claim limitation, whereas under the doctrine the accused product is compared to the claim limitation. *Alpex,* 102 F.3d at 1222, 40 USPQ2d at 1673–74. The *Valmont* court

---

**1.** As in the court's opinion, I follow the custom of referring to claim "limitations" rather than claim "elements."

went further and opined that a statutory equivalent under § 112, ¶ 6 "does not involve the equitable tripartite test of the doctrine of equivalents," i.e., the so-called function-way-result test. *Valmont*, 983 F.2d at 1043, 25 USPQ2d at 1455. This was thought to follow from the fact that "the sole question" under § 112, ¶ 6 involves comparison of the structure in the accused product to the structure in the specification. *Id.*

However, these perceived distinctions appear to be either nonexistent or without significance, or are at least beyond what we can reasonably expect the triers of fact to sensibly discern. With regard to the distinction set forth in *Alpex*, the comparison, for purposes of the doctrine of equivalents, of an accused product to a claim limitation drafted pursuant to § 112, ¶ 6 necessarily involves a comparison to the corresponding structure described in the specification. This is because § 112, ¶ 6 mandates that such limitations are to be construed to cover the described corresponding structures (and their equivalents). Indeed, if the comparison under the doctrine is merely to the language in the claim, the comparison cannot be meaningfully made because, by definition, the § 112, ¶ 6 claim limitation recites no structure, material or acts.

Considered another way, without reference to the corresponding structures described in the specification, any and all structures which perform the specified function would satisfy the claim limitation under the doctrine. That is clearly not the law of this court. For example, in *Valmont*, in applying the function-way-result test for purposes of the doctrine of equivalents, the court determined that there was not infringement, under the doctrine, of a claim drafted pursuant to § 112, ¶ 6 because the accused device was very different from that described in the patent.[2] *Valmont*, 983 F.2d at 1044, 25

USPQ2d at 1456. Thus, whether considering infringement under § 112, ¶ 6 or the doctrine of equivalents, a comparison must be made to the described structure corresponding to the § 112, ¶ 6 claim limitation.

With regard to the suggestion in *Valmont* that the function-way-result test is not applicable to determining equivalence under § 112, ¶ 6, it is not readily apparent why use of the "way" and "result" parts of the tripartite test, to the extent that test is useful at all, would not also be helpful in the § 112, ¶ 6 context. (With regard to the "function" part of the test, the statute already carries with it a requirement that the specified function be the same.) Indeed, in a case decided prior to *Valmont*, this court opined that the same tripartite test *does* apply to determining equivalence under the statute:

> Whether the issue is equivalency of a means that is described in the specification to perform a function in a "means" clause of a combination claim (*i.e.*, literal infringement), or equivalency to the claimed invention as a whole (*i.e.*, infringement by the doctrine of equivalents), the test is the same three-part test of history: does the asserted equivalent perform substantially the same function in substantially the same way to accomplish substantially the same result. (In the case of "means" clauses, of course, the function is that stated in the claim.)

*Texas Instruments, Inc. v. United States Int'l Trade Comm'n*, 805 F.2d 1558, 1571, 231 USPQ 833, 841 (Fed.Cir.1986).[3] Furthermore, given the statements in *Valmont* and *Alpex* that under both statute and doctrine the issue is insubstantial changes and, given this court's more-recent statement that the question of insubstantial differences under the doctrine may be satisfied by way of the tripartite test, *see Hilton Davis Chem. Co. v. Warner–Jenkinson Co.*, 62 F.3d 1512, 1517–

---

2. This comparison was made with respect to the "way" part of the function-way-result test. *Valmont*, 983 F.2d at 1044, 25 USPQ2d at 1456.

3. Contrary to the references to equivalency "to the claimed invention as a whole" in *Texas Instruments*, 805 F.2d at 1571, 231 USPQ at 841, and *Valmont*, 983 F.2d at 1044, 25 USPQ2d at 1456, equivalents under the statute and doctrine can no longer be distinguished by the proposition

that equivalence under the doctrine can apply to the claimed invention as a whole. The Supreme Court eliminated that possible distinction by requiring equivalence under the doctrine on a limitation-by-limitation basis. *See Warner–Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, ——, 117 S.Ct. 1040, 1049, 137 L.Ed.2d 146, 41 USPQ2d 1865, 1871 (1997).

18, 35 USPQ2d 1641, 1645 (Fed.Cir.1995) (in banc), *rev'd on other grounds,* 520 U.S. 17, 117 S.Ct. 1040, 137 L.Ed.2d 146, 41 USPQ2d 1865 (1997), it is difficult to understand why the tripartite test would not also be available to resolve the question of insubstantial changes under the statute.

There are no doubt other application details under the statute and doctrine that have developed in the case law over the years. One could attempt to distinguish the tests for equivalence based on such details. However, such an analysis begs the ultimate questions: What if any difference is there between the scope of protection provided? Can triers of fact sensibly discern any such difference? Given the substantial risk of confusion, should there be two notions of equivalents?

To date, the descriptions offered of the differences between equivalents under the statute and under the doctrine, though they may accurately capture the two ways in which the notion of equivalents has developed and is thought to function, provide little of real guidance to a trier of fact called upon to distinguish the *scope* of one kind of equivalent from the other. More to the point, the existence of two "different" notions of equivalents cannot help but add a further source of confusion, especially when submitted to a jury for decision based on the kinds of explanatory material available in the cases.

In the case before us, the jury was charged to answer whether the claim at issue was literally infringed. The jury's response was "No." Because the claim consisted solely of means-plus-function limitations, literal infringement required a finding that the accused device performed the specified functions recited in the means-plus-function limitations with structure the same as or equivalent to the corresponding structure described in the specification. *See, e.g., Valmont,* 983 F.2d at 1042, 25 USPQ2d at 1454 (setting forth the test for literal satisfaction of a means-plus-function limitation). There appears to be no genuine issue with regard to the specified functions; the accused device appears to perform the functions recited in the means-plus-function claim limitations (and I assume such to be the case). Thus, as a matter of statutory construction and controlling precedent, the jury verdict on literal infringement means that, in the jury's view, the accused device had neither the corresponding structure described in the specification *nor* equivalents thereof.

But the jury was further charged to answer whether the claim at issue was infringed under the doctrine of equivalents. To this question the jury answered "Yes." What could that mean? The jury, by its vote on literal infringement, had already ruled out infringement based on the corresponding structure, and, as a matter of established law, it had also ruled out infringement based on equivalent structure, because that also would have been properly classified as "literal" infringement.

Given that, a finding of infringement under the doctrine of equivalents could only mean that there is something perceivably different between an equivalent under the doctrine and the equivalent, or lack thereof, under the statutory test. What this could possibly be escapes me. Beyond that, is it possible that the jury thought there was something called an equivalent of an equivalent, and that is what the jury found to exist?

These are not simply matters of semantics. They go to the very act of deliberative decision making, decision making based on a meaningful rule of law. However many variations there are in the words we use to describe the criteria by which to determine when something in fact is the "equivalent" of something else, *see, e.g., Hilton Davis,* 62 F.3d at 1517–18, 35 USPQ2d at 1645 (defining equivalence as "insubstantial differences" and mentioning that that test may be satisfied where the function, way and result are substantially the same), the basic notion of equivalence does not vary. An equivalent is something that is "equal in force or amount," "like in signification or import," "synonymous," etc. *Webster's Third New International Dictionary* 769 (1986). If B is *not* the equivalent of A, using one understanding of equivalent, can it be said that B *is* the equivalent of A, using a second undefined or similarly understood meaning of equivalent ? Worse yet, can it be said that B is the equivalent of the (unknown) equivalent of A? Stating a rule of law to permit that manner

of thinking is simply an invitation to confused thinking. It certainly invites results that defy understanding.

Our cases seem to assume, without examining the question beyond that discussed above, that these two different kinds of equivalents exist, and that they are available to a trier of fact when dealing with infringement of a claim drafted pursuant to § 112, ¶ 6. *See, e.g., Alpex Computer Corp. v. Nintendo Co.,* 102 F.3d 1214, 40 USPQ2d 1667 (Fed.Cir.1996) (in reviewing a jury verdict of infringement, analyzing whether a means-plus-function limitation was satisfied literally or under the doctrine of equivalents), *cert. denied,* —— U.S. ——, 117 S.Ct. 2480, 138 L.Ed.2d 989 (1997); *Valmont Indus., Inc. v. Reinke Mfg. Co.,* 983 F.2d 1039, 25 USPQ2d 1451 (Fed.Cir.1993) (same); *Sofamor Danek Group, Inc. v. DePuy–Motech, Inc.,* 74 F.3d 1216, 37 USPQ2d 1529 (Fed.Cir.1996) (in reviewing a denial of a motion for preliminary injunction, analyzing likelihood of success of establishing that a means-plus-function limitation was met literally or under the doctrine of equivalents); *D.M.I., Inc. v. Deere & Co.,* 755 F.2d 1570, 225 USPQ 236 (Fed.Cir.1985) (reversing summary judgment of noninfringement upon finding genuine issues of fact existed as to whether a means-plus-function limitation was met literally or under the doctrine of equivalents). In the case before us, neither party seemed to find the idea of two different notions of equivalents problematical before or during trial, although on appeal Kentucky Farms argues that the jury's verdicts on literal infringement and infringement under the doctrine of equivalents are inconsistent.

Though the question of two kinds of equivalents has never been addressed head-on by this court, commentators have addressed it, and found this court's practice anomalous. *See* Laurence H. Pretty & Janene Bassett, *Reconciling Section 112, Paragraph 6 with the Doctrine of Equivalents in the Wake of*

Warner–Jenkinson Co. v. Hilton Davis Chemical, 489 PLI/Pat 359, 378, 391–92 (1997) (concluding that the equivalence analyses under § 112, ¶ 6 and the doctrine of equivalents are virtually the same and therefore proposing the adoption of a single equivalence analysis for means-plus-function limitations); Mark D. Janis, *Unmasking Structural Equivalency: The Intersection of § 112, ¶ 6 Equivalents and the Doctrine of Equivalents,* 4 Alb. L.J. Sci. & Tech. 205, 227 (1994) (concluding that § 112, ¶ 6 and the doctrine of equivalents share the same concept of equivalence and therefore recommending that the same test of equivalence be used for both).

It should be remembered that § 112, ¶ 6 was a legislative solution to a problem in claiming—broadly stated claims using means-plus-function language were too vague to be judicially enforced. *See Valmont,* 983 F.2d at 1042, 25 USPQ2d at 1453–54 (noting that § 112, ¶ 6 was enacted in response to the Supreme Court prohibiting certain use of means-plus-function language in *Halliburton Oil Well Cementing Co. v. Walker,* 329 U.S. 1, 67 S.Ct. 6, 91 L.Ed. 3 (1946)). The purpose of § 112, ¶ 6 was to provide clear parameters within which means-plus-function claims could be drawn and sensibly construed. Speaking in terms of dual and competing notions of equivalents seems to me to be wholly inconsistent with that legislative purpose. Furthermore, the doctrine of equivalents is a judge-made solution to a concern about overly-literal infringers. Congress having expressly provided against an overly-literal reading of § 112, ¶ 6 claims by allowing for equivalents, there would seem to be no justification for intrusion by the courts to duplicate or differ from the legislative solution.[4]

In that light, and consistent with that purpose, I believe that the practice of claiming under § 112, ¶ 6 would be much improved if we adhered to the proposition that the

---

4. As noted by one commentator, there is evidence that Congress intended § 112, ¶ 6 to codify the doctrine of equivalents for claim limitations written in functional terms. *See* David R. Todd, *How Modern Treatment of 35 U.S.C. § 112(6) Has Caused Confusion:* Hilton Davis v. Warner Jenkinson *and the Right to a Jury on the Issue of*

*Patent Infringement Under the "Equitable" Doctrine of Equivalents,* 1996 B.Y.U. L.Rev. 141, 156 & n. 74 (citing Congressman Joseph R. Bryson's comment that § 112, ¶ 6 "gives recognition to the existence of the doctrine of equivalents" (citation omitted)).

"equivalents" of "structure, material, or acts described in the specification" are those found to be within the scope of that term as it is used in § 112, ¶ 6, and not elsewhere. Accordingly, the separate judicially-created doctrine of equivalents would have no application to those aspects of limitations drawn in means-plus-function form. This result is fully consistent with the legislative purpose of § 112, ¶ 6 and with its plain language which expressly provides for equivalents with regard to those parts of a means-plus-function claim for which Congress chose to permit equivalents.[5]

In the case before us, whether one views the jury's verdict as finding equivalents solely under the statutory grant or under the judicially-defined doctrine of equivalents, no reasonable jury could have found that the accused device was equivalent. Whether the error would have been avoided had the jury been limited solely to determining literal infringement (including of course one level of "equivalents"), is unknown, and for this case at least, irrelevant. I do believe, however, that limiting a jury (as well as ourselves) to one notion of equivalents at a time can only help.

NEWMAN, Circuit Judge, additional views.

I write separately to respond to the "additional views" filed by Judge Plager. With all respect to my thoughtful colleague, his proposal that established law should be changed, even were such change available to the judges of this court, simply moves the Federal Circuit farther from the principles of stare decisis. This already difficult area of law will not benefit from added uncertainty.

The distinction between the doctrine of equivalents and section 112 equivalents, if confusing to jurors, has long been understood by practitioners of patent law. These different rules serve different purposes. Other than further to restrict the doctrine of equivalents, I know of no policy reason for

eliminating access to the doctrine of equivalents with respect to the claimed function when claims are written in "means-plus-function" form. The style of claims is not the sine qua non of the patent right, and the equitable purposes of the doctrine of equivalents do not rise and fall with whether the patentee used the claim form authorized in section 112 paragraph 6.

Precedent has often explained and implemented the distinct purposes of these two practices. *E.g., Pennwalt Corp. v. Durand-Wayland, Inc.,* 833 F.2d 931, 934, 4 USPQ2d 1737, 1739 (Fed.Cir.1987) (*en banc* ) ("Section 112, paragraph 6, plays no role in determining whether an equivalent function is performed by the accused device under the doctrine of equivalents."); *Alpex Computer Corp. v. Nintendo Co.,* 102 F.3d 1214, 1222, 40 USPQ2d 1667, 1673 (Fed.Cir.1996) ("While equivalency under the doctrine of equivalents and equivalency under § 112, ¶ 6, both relate to insubstantial changes, each has a separate origin, purpose and application."); *Valmont Industries Inc. v. Reinke Manufacturing Co.,* 983 F.2d 1039, 1043, 25 USPQ2d 1451, 1454 (Fed.Cir.1993) ("The doctrine of equivalents has a different purpose and application than section 112.") Although laypersons may have trouble understanding this distinction, that can be said of many areas of law. Indeed, the jury problem that Judge Plager identifies in this case could have been easily avoided by presenting more explicit special verdicts.

The proposed elimination of recourse to the doctrine of equivalents for claim elements described in means-plus-function form would markedly diminish the scope of the doctrine. This step has no support in precedent. Whether or not further restriction on the doctrine of equivalents will be warranted as, in the fullness of time, more is learned of its role in the larger system of national innovation policy, it is inappropriate for this court to undertake such a major step sua sponte. Judge Plager's suggestion that the law is wrong will send a sure signal to litigants,

---

**5.** As previously noted, on the facts of this case we do not have before us a case of an accused device having a function different from that specified in the claim, and thus we do not have occasion to address the related question of whether a § 112,

¶ 6 claim limitation is limited to the "specified function," or whether it can also encompass an equivalent function under the doctrine of equivalents.

opening every district court to the argument. This can not add stability to patent law, or certainty to those seeking to conduct their business in reliance on law.

MICHEL, Circuit Judge, additional views.

I wonder if affording the patentee additional protection under the doctrine of equivalents conflicts with the very language and intent of 35 U.S.C. § 112(6) (1994), which covers only those "equivalents" disclosed in the specification.

As the Supreme Court reemphasized in *Warner–Jenkinson Co. v. Hilton Davis Chemical Co.*, 520 U.S. 17, ——, 117 S.Ct. 1040, 1051, 137 L.Ed.2d 146 (1997), the notice function of patents is critical.[1] Market participants as well as judges and jurors must be able to ascertain what subject matter is covered by the right to exclude. The notice function is especially important for the patentee's competitors, who need to shape their behavior by relying on the patent file. The need for clear notice is all the greater in the case of means-plus-function limitations because the claim language alone does not define the scope of protection.

As we have construed section 112(6), a patentee who claims an element of a mechanical device using means-plus-function language is entitled to protection of the corresponding structure(s) described in the specification and all "equivalent structures" (or, as some of our cases have termed them, "structural equivalents," *see, e.g., Alpex Computer Corp. v. Nintendo Co.*, 102 F.3d 1214, 1221 (Fed.Cir.1996); *Ven–Tel, Inc., v. Hayes Microcomputer Prods., Inc.*, 982 F.2d 1527, 1543 (Fed.Cir.1992)). Congress thus provided the patentee with two benefits from section 112(6): first, it need not claim structure but can simply rely on the written description and drawings to obtain protection

for all of its disclosed structures; and second, it gets protection of all equivalents of whatever structures it has disclosed in its specification. Did Congress intend that the price for those benefits was foregoing coverage of even broader equivalents under the doctrine?

Is it contrary to section 112(6) to expand the protection for inventions claimed partly in means-plus-function format by also applying the doctrine of equivalents to limitations claimed in that format, when protection for some but not all equivalents has already been incorporated into the statute itself and when doing so further diminishes the notice function of the patent? Or, did Congress intend the courts to apply the doctrine of equivalents to the means-plus-function format just as we apply the doctrine to structural formats?

Until we are required to review a case in which these issues actually have been litigated,[2] we cannot answer the questions raised in the three additional views here.

---

1. The Supreme Court said it was "[m]indful that claims do indeed serve both a definitional and a notice function." *Id.*

2. Although the opinions in *Pennwalt, Alpex,* and *Valmont* discuss quite thoroughly the distinctions between structural equivalence and the doctrine of equivalents in the context of section 112(6) claims, all three cases simply presumed that the doctrine applied to such claims, and none of the cases turned on a challenge to the application of the doctrine. *See Pennwalt Corp. v. Durand–Wayland, Inc.*, 833 F.2d 931, 934–35 (Fed.Cir. 1987) (in banc); *Alpex Computer Corp. v. Nintendo Co.*, 102 F.3d 1214, 1222–23 (Fed.Cir.1996); *Valmont Indus., Inc. v. Reinke Mfg. Co.*, 983 F.2d 1039, 1042–44 (Fed.Cir.1993). Similarly, no explicit challenge to the doctrine was made in this appeal.