Randy L. WESTCOTT, Plaintiff,

v.

UNITED STATES, Defendant.

No. 95–626C.

United States Court of Federal Claims.

Oct. 27, 1998.

Robert B. Kennedy, Kennedy & Kennedy, Atlanta, Georgia, attorney of record, for plaintiffs.

B. Frederick Buchan, Jr., Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., with whom were Vito J. DiPietro, Director, and Frank W. Hunger, Assistant Attorney General, attorneys of record, for the defendant.

## OPINION

HORN, Judge.

This matter comes before the court on the defendant's motion for summary judgment of non-infringement, submitted pursuant to Rule 56 of the Rules of the United States Court of Federal Claims (RCFC), and on plaintiff's subsequent cross-motion for summary judgment of infringement. Plaintiff, Randy L. Westcott, alleges that defendant, the United States of America, has violated 28

U.S.C. § 1498 prohibiting the United States from using or manufacturing patented inventions without the patent owner's permission. Plaintiff contends that defendant, through the Department of the Navy, is using products called the Multi–Drawer Destruct Cabinet (MDDC) and the Single–Drawer Destruct Cabinet (SDDC) within the scope of plaintiff's United States Letters Patent No. 4,236,463 (the '463 patent) for a "Tamper Proof Case for the Protection of Sensitive Documents." In his first amended complaint, plaintiff seeks compensation for unauthorized use and manufacture of his patented devices, as well as interest, attorney's fees and costs.

Defendant argues in principal that its devices do not infringe the '463 patent because the MDDC and SDDC do not possess an element claimed by the patent, a "switch means." Because of the prior art over which the '463 patent was granted and the wording of its claims, defendant contends that "switch means" is limited to automatic switches reacting to unauthorized tampering with the case or unauthorized attempts to view documents in the case. According to defendant, the MDDC and SDDC do not possess switches of the automatic type, so there can be no infringement. Conversely, plaintiff responds that the claims, specification and patent history give no indication that its protection should be limited to exclude manual switches like the firing handle of the defendant's devices.

After careful consideration of the record, the parties' filings, and the relevant law, the court's claim construction for the '463 patent limits plaintiff's protection to "automatic" switches not found in defendant's devices. Thus, the court grants the defendant's motion for summary judgment of non-infringement.

## FACTUAL BACKGROUND

The plaintiff, Randy L. Westcott, has been the owner of the entire right, title and interest in United States Letters Patent No. 4,236,463 (the '463 patent) since its issuance on December 2, 1980, by the United States Patent and Trademark Office. The plaintiff has brought suit against defendant the United States of America pursuant to 28 U.S.C. § 1498(a) (1994)[1] seeking compensation for alleged unlicensed manufacture or use by or for the Department of the Navy of devices claimed in the '463 patent.

Mr. Westcott's patent is titled "Tamper Proof Case for the Protection of Sensitive Papers." According to the patent, plaintiff's invention "relates to a tamper proof case for the protection of sensitive papers, such as secret documents, and for their destruction under prescribed conditions...." In particular, the patent describes "a portable carrying case which will burn the documents within the case when the case is compromised." It is meant for use by parties such as banks, governments and companies which need to transport confidential information. Figure 2 of the '463 patent is reproduced below for reference.

---

1. 28 U.S.C. § 1498(a) states:
 **Patent and copyright cases**
 (a) Whenever an invention described in and covered by a patent of the United States is used or manufactured by or for the United States without license of the owner thereof or lawful right to use or manufacture the same, the owner's remedy shall be by action against the United States in the United States Court of Federal Claims for the recovery of his reasonable and entire compensation for such use and manufacture....

FIG 2

The patent's Summary of the Invention section describes the tamper-proof case. With reference numbers added by the court (where possible) in brackets, it reads:

the present invention includes a brief case, attache case, closure or container having a body portion [10] to which is hingedly secured a lid or top [20] which, when closed, can be locked in the closed position. Insulation [16] surrounds the interior of the body portion [10] and lid [20] and a wire screen grid [27] is provided over the lid [20]. The lid [20] is also perforated so that gases may readily escape from the interior of the container.

A liner [80] is hingedly secured along a hinge [84] on the interior of the case, the liner [80] being provided with insulating material [85] along the inside thereof. A removable boat [90] carries a pyrotechnic charge [100] of thermite on the interior of the liner [80]. The thermite is set off by electrical igniters which are connected, through a key operated selector switch [70] and various switch means, to a battery. The switch means are actuatable upon a change in the physical condition of the closure. Among the various switch means are the electrically conducting inner and outer coverings of the body portion and the lid, which, if a knife is inserted therethrough, will close the circuit to set off the igniters. Furthermore, the rim [30, 31] of the closure is provided with contact strips which, if shorted, will close the circuit to set off the thermite. Still another switch arrangement includes a mercury switch which, when tilted will close the circuitry to set off the thermite. Still another switch [52] is included in the handle [45], the switch being normally closed but opened when the handle [45] is grasped and will close if the grasp of the person carrying it is released. A switch is also disposed close to the handle [45] for manual actuation in the event that the contents are threatened. Still another switch means [35] is closed when the case is opened. The arming of the aforesaid switches are [sic] selectively controlled by the selectively positionable key operated lock switch [70].

The patent contains eighteen claims which define the invention's scope. Of these, the

plaintiff claims infringement of Claims 1 and 10. Claim 1 is the only independent claim. Claim 10 is a dependent claim, which refers to Claim 1. They read as follows:

1. A case for the protection of secret documents comprising:

(a) a closure having opposed body portions defining an interior and an access opening for access into said interior, said closure being provided with a hole communicating with the interior and through which gases may readily escape when said closure is closed;

(b) a liner disposed within the interior of said closure, said liner having, itself, an open interior and an access opening communicating with said open interior, through which documents may be inserted and removed from said open interior, said open interior of said liner and said interior of said closure communicating so that gases from said interior of said liner may pass through said interior of said closure and out of said hole;

(c) a pyrotechnic charge within said liner;

(d) switch means on said closure actuatable upon a change in the physical condition of said closure;

(e) igniter means in close proximity to said pyrotechnic charge and electrically connected to said switch means for igniting said pyrotechnic charge when said igniter means is actuated;

(f) a source of current carried by said closure and electrically connected to said switch means and to said igniter means for actuating said igniter means when said switch means is actuated; and

(g) control means for said switch means for rendering said switch means actuateable [sic] or nonactuatable.

* * *

10. The case defined in claim 1 wherein said igniter means are a plurality of squibbs disposed in spaced relationship adjacent to said pyrotechnic charge.

Claims 2 through 18 are all dependent claims which add particular substance to, and therefore narrow, the scope of independent Claim 1. The dependent claims which have further express limitations drawn to switches and features of switches are Claims 4–9 and 15–18. The text of these claims reads:

4. The case defined in claim 1 wherein said switch means includes a switch disposed adjacent to the access opening of said closure and actuatable when said closure is opened.

5. The case defined in claim 1 including a handle mounted on said closure, a switch disposed within said handle and means on said handle for opening said switch when said handle is grasped by a person.

6. The case defined in claim 1 including a handle on said closure and switch means disposed adjacent to said handle for actuation manually.

7. The case defined in claim 5 wherein said closure is electrically conducting and wherein said switch means includes a grid disposed within the interior of said closure for making an electrical circuit with said closure when an electrical [sic] conducting object engages said closure and said grid simultaneously.

8. The case defined in claim 1 wherein said control means is a lock switch which can be locked in a closed position or in an open position, said switch being in series with said switch means when in its closed position.

9. The case defined in claim 7 wherein said switch means includes a plurality of switches disposed adjacent to the access opening of said case for actuation when said case is opened and including additional switch means disposed adjacent to said handle, said additional switch means and said switches being respectively actuatable for actuating said igniter means.

* * *

15. The case defined in claim 1 wherein said switch means includes a switch carried by said closure, said switch being normally open when said closure is resting upon a flat surface but being closed when said closure is tilted from its position of resting on said flat surface.

16. The case defined in claim 15 wherein said switch is a mercury switch.

17. The case defined in claim 16 wherein said mercury switch is electrically open when said case is resting in a horizontal position but is closed when said case is moved appreciably from either of the aforesaid positions.

18. The case defined in claim 1 wherein said switch means includes a pair of spaced electrically conducting strips disposed adjacent to each other along the access opening of said closure, said strips being in close proximity to each other for closing when an electrical [sic] conducting object is inserted into said access opening and contacts both of said strips.

To operate the case, a user places secure documents in the compartment defined by the interior liner, closes the case and closes the exterior fasteners. At this point, the electrical anti-theft mechanisms of the case are not engaged. To activate these mechanisms, the user first places a key in the key-operated selector switch located near the handle of the case. The user then turns the selector switch from the "off" position to one of three "engaged" positions which the patent refers to as T1, T2 and T3.

When the switch is in any of the three "engaged" positions, a circuit will be completed (and destruction of the papers effectuated) if someone pries open the case or punctures the case with an electrically conductive object. If someone pries open the case, spring-loaded plungers will no longer be forced by the lip of the case into their "open-circuit" position. These plungers will move into a "closed-circuit" position and allow current from the case's battery to ignite the thermite explosive. If someone punctures the case with an electrically conductive object, this will connect the normally separated case shell and an interior metal grid to close an electrical circuit. This, too, will allow current from the case's battery to ignite the thermite explosive.

In addition to these safeguards, when the key-operated selector switch is in position T1 the thermite explosive can be activated by pressing a manually operated self-destruct button located close to the case handle. This closes a circuit between the battery and the explosive. When the switch is in position T2, the explosive will activate if the case carrier releases his or her grip on the handle; this allows a spring to move a switch and close a circuit between the battery and the explosive. Last, if the switch is in position T3, both the self-destruct button and the handle grip switch features are activated for possible destruction of the case contents.[2]

At its conclusion, Mr. Westcott's '463 patent also contemplates the optional use of two additional types of electrical switches. The first of these is a set of electrically conductive strips on the opposing rims of the case's top and bottom. An attempt to pry open the lid with a conductive item such as a metal knife would contact both rims and close a circuit between the battery and the thermite explosive. The second additional type of switch mentioned is a mercury gravity switch. This switch would close a circuit between the battery and the explosive if the case were tilted from a certain horizontal or vertical position.

In 1983, Mr. Westcott became aware of a solicitation by the Naval Regional Contracting Center (NRCC). The solicitation invited proposals for the development of several types of Anti–Compromise Emergency Destruct (ACED) Systems, including briefcase destruct systems. On May 19, 1983, plaintiff's patent attorney, George M. Hopkins, sent a letter to the NRCC alleging that the manufacture and/or use of the ACED systems would possibly infringe one or more claims of the '463 patent, including Claim 1. This letter also indicated that Mr. Westcott would be willing to grant the Navy a nonexclusive license for a 5% net selling price royalty on any systems which the '463 patent

---

2. The court notes that, according to the Figure 8 circuit diagram shown in the '463 patent, moving the key-operated selector switch to position T3 would instantly destroy the case contents by completing a circuit between the battery and the thermite explosive. For the purposes of this opinion only, the court will therefore assume that this circuit diagram is in error concerning position T3. The court will treat the explanation concerning position T3 at column 7, lines 8–12, in the Description of the Preferred Embodiment section as correct.

covered. On June 10, 1983, James Dennis Frew of the Office of Naval Research (ONR) informed Mr. Hopkins by letter that his May 19 letter had been forwarded to ONR and that ONR's Patent Counsel, W.F. McCarthy, was examining the situation.

After several reminder letters from Mr. Hopkins, Mr. McCarthy advised plaintiff by letter on August 31, 1983, that a contract pertaining to the destruct systems solicitation might be awarded in November of 1983. The Navy would not decide on plaintiff's license proposal until it could determine "whether the end item configuration of the proposed procurement [might] be covered by the ['463] patent."

On November 10, 1983, Mr. Hopkins sent Mr. McCarthy a letter asserting an administrative claim against the Navy for infringement and referring to the ACED systems. The ONR denied this claim in a November 29, 1983, letter from Mr. McCarthy. The ONR acknowledged the issuance of the solicitation, but stated that it was uncertain at that time what the final system design would look like and whether that design would meet the required solicitation performance standards. The ONR also did not foresee the actual procurement of the systems until 1987. In the ONR's opinion, these conditions made it impossible to find any infringement on the Navy's part. In addition, the ONR expressed its opinion that Mr. Westcott's '463 patent was invalid.[3] On December 28, 1983, the plaintiff requested reconsideration of the infringement claim denial. Mr. McCarthy responded on February 2, 1984, that there was no basis to reconsider the denial absent specific factual data supporting plaintiff's position.

The plaintiff took no further action on this issue until 1994, some 10 years later. It was then that plaintiff learned of a brochure entitled "When a Shredder Won't Do." This brochure, written by Mr. Magdy M. Bichay of the Cartridge Actuated Devices, Propellant Actuated Devices Department of the Indian Head Division of the Naval Surface Warfare Center, displays and describes the devices known as the multi-drawer destruct cabinet (MDDC), the single-drawer destruct cabinet (SDDC), the portable document destruct device (PDDD) and the hard-disk drive destruct system (HD3S).

A schematic representation of the SDDC and MDDC is provided below for reference.[4] The MDDC is an ACED device fabricated from a Mosler® brand safe. It has a hinged outer door with a locking mechanism including a combination lock and handle. The safe's exterior is modified to include top, left side, rear and bottom exhaust baffles communicating with both the safe's interior and an exhaust port at the rear of the cabinet top. There is a lockable safe-and-arm access door at the cabinet's top front through which an operator gains access to the firing mechanism and safe-and-arm lock. After closing the safe drawers and locking its main door, the safe-and-arm lock is turned to the ARM position to mechanically release the firing handle for possible destruction of the safe contents.

The safe's interior is modified to include three document drawers and rails upon which the drawers slide. Along the bottom of each drawer is a lower oxidizer charge pack assembly which is not electrically connected to anything. Above each drawer is an upper destruct package containing an oxidizer charge and an igniter assembly (or "squib.")

Each ignition circuit consists of a percussion actuated thermal battery and a firing

---

3. The ONR stated its opinion that the invention was

> invalid under 35 U.S.C. § 112, obvious under 35 U.S.C. § 103, void under 35 U.S.C. § 101 due to lack of utility, void under 35 U.S.C. § 102(a) and (b) as the invention was known or used by others in this country or patented or described in a printed publication before the invention thereof by the applicant for patent, and also anticipated under 35 U.S.C. § 102.

4. The parties filed a Joint Appendix to this case. Volume I, page 138 provides the cutaway diagram for the SDDC. Volume I, page 160 provides the cutaway diagram for the MDDC. For reasons unknown to this court, these diagrams are identical. As the diagram shows only one drawer, it is apparently a depiction of the SDDC. Because the devices are similar in construction, the court will reference the cutaway diagram in the paragraphs which describe both the MDDC and SDDC.

circuit. The batteries can only be activated to produce an output when a firing pin strikes their battery primers. The firing pin, in turn, will only strike the primers when the firing handle is pulled. The firing circuits consist of no other switches other than two relay switches. These relay switches allow current to flow through the circuits only when the battery output reaches a sufficiently high level. This prevents common electromagnetic signals from unintentionally inducing a current to flow through the circuits. When an operator pulls the firing handle of the firing mechanism, the thermal battery is explosively activated to produce its output. Sufficient current then travels through the circuits to activate the squibs and trigger an irreversible ignition of each upper destruct package, burning any documents in the drawers. The resultant explosion and fire ignites the lower oxidizer charges in the bottom of each drawer. A fourth squib is positioned to destroy an exhaust port seal to allow the exit of combustion by-products after they pass out of the drawers and through the safe's baffles.

FIGURE 1-3. SINGLE DRAWER DESTRUCT CABINET (CUTAWAY DIAGRAM)

The SDDC is nearly identical to the MDDC. The SDDC differs only in that it is smaller in size, has just one drawer, and uses fewer igniter squibs. Neither the MDDC nor the SDDC has a switch or mechanism which can sense a change in the orientation of the cabinet; thus, a change in cabinet orientation cannot trigger ignition. Neither the MDDC nor the SDDC has an electrical switch that operates the ignition circuit in response to any of (1) opening the safe door, (2) attempting to pry open the safe door, (3) tilting the safe or (4) piercing the safe's exterior.

Upon learning of the existence of these devices, the plaintiff contacted his new counsel, Robert B. Kennedy. Mr. Kennedy then

sent letters both to the Director of the ACED program at the Naval Surface Warfare Center and to the Navy's Patent Counsel. These identical letters, sent on February 22, 1995, alleged that the MDDC, SDDC and PDDD were infringing the '463 patent and asserted an administrative claim for infringement. The ONR again denied Mr. Westcott's administrative claim on June 15, 1995.

Plaintiff then filed the original Complaint in this action entitled *Randy L. Westcott v. United States*, No. 95–626C. The complaint alleged that each of the MDDC, SDDC, PDDD and HD3S infringed one or more claims of the '463 patent. The defendant United States moved for summary judgment alleging non-infringement. Plaintiff then filed a First Amended Complaint which dropped the allegations of infringement as to the PDDD and HD3S, but continued to allege that the MDDC and SDDC infringe one or more claims of the '463 patent. Plaintiff later filed a cross-motion for summary judgment on May 22, 1996, in which he limited his infringement claim to his current contention that the MDDC and SDDC infringe Claims 1 and 10 of the '463 patent.

## DISCUSSION

### A. Summary Judgment

The plaintiff and defendant in the above-captioned case have filed cross-motions for summary judgment. Summary judgment in this court should be granted only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. RCFC 56 is patterned on Rule 56 of the Federal Rules of Civil Procedure (Fed.R.Civ.P.) and is similar both in language and effect.[5] Both rules provide that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any

material fact and that the moving party is entitled to a judgment as a matter of law."

RCFC 56(c) provides that in order for a motion for summary judgment to be granted, the moving party bears the burden of demonstrating that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Creppel v. United States*, 41 F.3d 627, 630–31 (Fed.Cir.1994); *Meyers v. Asics Corp.*, 974 F.2d 1304, 1306 (Fed.Cir.1992); *Lima Surgical Assocs., Inc. Voluntary Employees' Beneficiary Ass'n Plan Trust v. United States*, 20 Cl.Ct. 674, 679 (1990), *aff'd*, 944 F.2d 885 (Fed.Cir.1991); *Rust Communications Group, Inc. v. United States*, 20 Cl.Ct. 392, 394 (1990). Disputes over facts which are not outcome determinative under the governing law will not preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment, however, will not be granted if "the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury [trier of fact] could return a verdict for the nonmoving party." *Id.; see also Uniq Computer Corp. v. United States*, 20 Cl.Ct. 222, 228–29 (1990).

When reaching a summary judgment determination, the judge's function is not to weigh the evidence, but to determine whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 249, 106 S.Ct. 2505; *see, e.g., Cloutier v. United States*, 19 Cl.Ct. 326, 328 (1990), *aff'd*, 937 F.2d 622 (Fed.Cir.1991). The judge must determine whether the evidence presents a disagreement sufficient to require submission to fact finding, or whether the issues presented are so one-sided that one party must prevail as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 250–52, 106 S.Ct. 2505. When the record could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial,

---

5. In general, the rules of this court are patterned on the Federal Rules of Civil Procedure. Therefore, precedent under the Federal Rules of Civil Procedure is relevant to interpreting the rules of this court, including RCFC 56. *See Jay v. Secretary DHHS*, 998 F.2d 979, 982 (Fed.Cir.1993); *Imperial Van Lines Int'l, Inc. v. United States*, 821 F.2d 634, 637 (Fed.Cir.1987); *Lichtefeld–Massaro, Inc. v. United States*, 17 Cl.Ct. 67, 70 (1989).

and the motion must be granted. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). If the nonmoving party cannot present evidence to support its case under any scenario, there is no need for the parties to undertake the time and expense of a trial, and the moving party should prevail without further proceedings.

If, however, the nonmoving party produces sufficient evidence to raise a question as to the outcome of the case, then the motion for summary judgment should be denied. Any doubt over factual issues must be resolved in favor of the party opposing summary judgment, to whom the benefit of all presumptions and inferences runs. *Id.; see also Litton Indus. Prods., Inc. v. Solid State Sys. Corp.*, 755 F.2d 158, 163 (Fed.Cir.1985); *H.F. Allen Orchards v. United States*, 749 F.2d 1571, 1574 (Fed.Cir.1984), *cert. denied*, 474 U.S. 818, 106 S.Ct. 64, 88 L.Ed.2d 52 (1985).

The initial burden on the party moving for summary judgment, to produce evidence showing the absence of a genuine issue of material fact, may be discharged if the moving party can demonstrate that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also Lima Surgical Assocs., Inc. Voluntary Employees' Beneficiary Ass'n Plan Trust v. United States*, 20 Cl.Ct. at 679. If the moving party makes such a showing, the burden then shifts to the nonmoving party to demonstrate that a genuine factual dispute exists by presenting evidence which establishes the existence of an element of its case upon which it bears the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. at 322, 106 S.Ct. 2548; *Lima Surgical Assocs., Inc. Voluntary Employees' Beneficiary Ass'n Plan Trust v. United States*, 20 Cl.Ct. at 679.

Pursuant to RCFC 56, a motion for summary judgment may succeed whether or not accompanied by affidavits and/or other documentary evidence in addition to the pleadings already on file. *Celotex Corp. v. Catrett*, 477 U.S. at 324, 106 S.Ct. 2548. Generally, however, in order to prevail by demonstrating that a genuine issue for trial exists, the nonmoving party will need to go beyond the pleadings by use of evidence such as affidavits, depositions, answers to interrogatories and admissions. *Id.*

The fact that both parties argue in favor of summary judgment and allege an absence of genuine issues of material fact, however, does not relieve the court of its responsibility to determine the appropriateness of summary disposition in the particular case. *Prineville Sawmill Co., Inc. v. United States*, 859 F.2d 905, 911 (Fed.Cir.1988) (citing *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed.Cir.1987)). "[S]imply because both parties moved for summary judgment, it does not follow that summary judgment should be granted one or the other." *LewRon Television, Inc. v. D.H. Overmyer Leasing Co.*, 401 F.2d 689, 692 (4th Cir.1968), *cert. denied*, 393 U.S. 1083, 89 S.Ct. 866, 21 L.Ed.2d 776 (1969); *see also Levine v. Fairleigh Dickinson Univ.*, 646 F.2d 825, 833 (3d Cir.1981); *Home Ins. Co. v. Aetna Casualty & Sur. Co.*, 528 F.2d 1388, 1390 (2d Cir.1976). Cross-motions are no more than a claim by each party that it alone is entitled to summary judgment. The making of such inherently contradictory claims, however, does not establish that if one is rejected the other is necessarily justified. *Rains v. Cascade Indus., Inc.*, 402 F.2d 241, 245 (3d Cir.1968); *Bataco Indus., Inc. v. United States*, 29 Fed.Cl. 318, 322 (1993), *aff'd*, 31 F.3d 1176 (Fed.Cir.1994). The court must evaluate each party's motion on its own merit, taking care to draw all reasonable inferences against the party whose motion is under consideration. *Mingus Constructors, Inc. v. United States*, 812 F.2d at 1391.

In the above-captioned case, the parties have filed extensive joint stipulations of fact and multiple volumes of a joint appendix to those stipulations. Both plaintiff and defendant state that no genuine issue as to any material question of fact exists and that summary judgment is therefore appropriate. Moreover, no issues which raise material issues of disputed fact have been identified by the court. Thus, the court determines that this case is ripe for summary disposition.

**B. Infringement**

■ The plaintiff, Randy L. Westcott, has accused the defendant United States of

America (hereinafter "the Navy"), of infringing the '463 patent. A patent infringement analysis involves two steps. First, the court determines the scope and meaning of the patent claims. Claim construction is a question of law entirely within the province of the court.[6] Second, the court compares the properly construed claims to the allegedly infringing device or process. *Mas–Hamilton Group v. LaGard, Inc.*, 156 F.3d 1206, 1210–11 (Fed.Cir.1998).

### 1. Claim construction

The heart of this dispute centers on the element (d) "switch means" of Claim 1 of the '463 patent. Element (d) claims as part of the invention a "switch means on said closure actuatable upon a change in the physical condition of said closure." This switch operates to close an electrical circuit that triggers the destructive explosion within the tamper-proof case. Plaintiff contends that the language of element (d) encompasses both switches which close automatically upon the occurrence of some particular event and switches which close only upon manual activation. Since defendant's MDDC and SDDC devices have manually activated firing handles triggering their document destruction, plaintiff claims that they infringe his patent. Defendant, however, argues that element (d) covers only the automatic switches and that the absence of this switch type in the MDDC and SDDC precludes any finding of infringement.

In interpreting an asserted patent claim, a court should examine the language of the claims, the patent's specification and, if in evidence, the patent's prosecution history. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed.Cir.1996). First, the court looks to the claim's words, both asserted and unasserted, to define the invention's scope. *Id.* Words are normally assumed to have their ordinary meanings, but a patentee may "choose to be his own lexicographer" and give words noncustomary meanings so long as any special definitions are clearly stated in the specification or file history. *Id.* Second,

the court examines the specification to identify any noncustomary meanings. *Id.* The specification acts as a dictionary by expressly defining claim terms or defining claim terms by implication. *Id.* (citing *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed.Cir.1995) (in banc), *aff'd*, 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996)). Third, if in evidence, the court considers the patent's prosecution history, which is the complete record of all proceedings in the Patent and Trademark Office and any express representations made by the applicant about a claim's scope. *Id.* The court may choose to examine prior art cited in the history because, as noted in *Autogiro Co. of America v. United States*, 181 Ct.Cl. 55, 384 F.2d 391, 399 (1967), "the prior art . . . gives clues as to what the claims do not cover" (citations omitted).

#### a. Language of the claims

To repeat, element (d) of Claim 1 reads "switch means on said closure actuatable upon a change in the physical condition of said closure." The closure is element (a) of Claim 1. The claim language denotes it as "a closure having opposed body portions defining an interior and an access opening for access into said interior, said closure being provided with a hole communicating with the interior and through which gases may readily escape when said closure is closed." The disagreement between Mr. Westcott and the Navy centers on the element (d) phrase "actuatable upon a change in the physical condition of said closure."

Plaintiff's position is that the manual action of pressing the '463 case's self-destruct button or releasing its handle to allow movement of the switch is a change in the physical condition of the closure. He states that "[m]anual actuation of [the MDDC and SDDC firing handles] constitute [sic] changes in the physical condition of the closures to which they are mounted just as manual operation of the several manual switches of the Westcott patent disclosure constitutes a change in the physical condition of the West-

---

6. "[J]udges, not juries, are the better suited to find the acquired meaning of patent terms." *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 388, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996); *see also Cybor Corp. v. FAS Technologies, Inc.*, 138 F.3d 1448, 1456 (Fed.Cir.1998).

cott closure." Thus, Mr. Westcott argues that the manually activated firing handles of the MDDC and SDDC are within the scope of element (d) and that those devices therefore infringe his patent.[7]

Plaintiff's argument, however, fails to recognize the significant implications of other language in Claim 1 and later claims. The element (d) language, in referring to "a change in the physical condition of said closure[,]" requires reference back to the element (a) closure. The closure, in turn, only is defined to consist of opposing body portions—the top and bottom portions of the case. Since the closure is not defined to include a handle or a button, activation of the manual switches via the releasing of the handle switch or the pressing of the self-destruct button would be, if anything, changes to the physical condition of the handle and the button, respectively. They would not be changes to the physical condition of the closure because they are simply not part of the closure. Likewise, a change in the physical condition of the closure by itself as the court defines it would have no effect on the manual switches. Thus, the manual switches would not be "actuatable" in that situation. Since the element (d) switch means must be actuatable upon a change in the physical condition of the closure, this indicates that the manual switches are not encompassed by Claim 1.

In contrast, the other '463 switches are capable of being actuated upon a change in the physical condition of the closure. These are switches which the court generally refers to as the "automatic" switches and the court examines each one in turn. First, insertion of an electrically conductive object such as a knife into one of the case body portions completes a circuit including the object, a body portion wall and a metal grid in the case interior. Rupturing the wall of the case is obviously a change in the physical condition of the closure. Second, prying open the case allows depressed plungers to spring out and complete another circuit. If the prying is attempted with an electrically conductive object, optional conductive metal strips on opposing rims of the upper and lower body portions will close a circuit as well. The opening of the case in these situations is also a change in the physical condition of the closure. Last, the case may include mercury gravity switches which would close a circuit if the case were displaced from a horizontal or vertical position. Here again, there would be a change in the physical condition of the closure via movement or disorientation of the closure. Unlike the manual switches, all of the automatic switches will close upon a change in the physical condition of the closure.

Further evidence that "switch means" includes the automatic, but not manual, switches is found in the '463 patent's other claims, specifically dependent Claims 4, 5, 6, 7, 9, 15 and 18. Claim 4 reads "[t]he case defined in claim 1 wherein said switch means includes a switch disposed adjacent to the access opening of said closure and actuatable when said closure is opened." This claim refers to the "plunger" switches which spring out to close a circuit when the case is opened. The claim clearly intends this type of automatic switch to be included within Claim 1's "switch means" by its use of the phrase "wherein said switch means includes ..." (emphasis added). *See generally Texas Instruments, Inc. v. United States Int'l Trade Comm'n,* 871 F.2d 1054, 1064 (Fed.Cir.1989) (using the same approach in construing "said" in claim language).

Claims 5 and 6, in contrast, describe the manual switches but do not use the "said switch means" language to refer to claim 1. Claim 5 reads "[t]he case defined in claim 1 including a handle mounted on said closure, a switch disposed within said handle and means on said handle for opening said switch when said handle is grasped by a person." The failure to use the "said switch means" phrasing is significant because it indicates that the handle switch described in Claim 5–a manual switch–does not refer back to the switch means element in Claim 1. Similarly, Claim 6 reads "[t]he case defined in claim 1 including a handle on said closure and switch

---

**7.** For the sake of argument, the court is assuming that the other Claim 1 elements are also present in the MDDC and SDDC. This is disput- ed by the Navy, and the court addresses this issue in section B.2.b. of this opinion, *infra.*

means disposed adjacent to said handle for actuation manually." Again, there is a failure to use the "said switch means" phrasing in the dependent claim. This leads to the conclusion that the self-destruct switch of Claim 6—the other manual switch—is distinct from the switch means of Claim 1. These claims support the notion that manual switches are additional switches not within the coverage of "switch means" in Claim 1.

The distinction between the manual and automatic switches is even more apparent in Claims 7 and 9. Claim 7 is dependent on Claim 1 via claim 5. Claim 7 reads "[t]he case defined in claim 5 wherein said closure is electrically conducting and wherein said switch means includes a grid disposed within the interior of said closure for making an electrical circuit with said closure when an electrical [sic] conducting object engages said closure and said grid simultaneously." Here again, the patentee has used the "said switch means" phrase when referring to one of the automatic switches. In particular, this is the switch which closes when a conductive object pierces or punctures the case.

Claim 9 also provides strong evidence that the manual switches are not within the meaning of "switch means" in Claim 1. Claim 9 reads

> [t]he case defined in claim 7 wherein said switch means includes a plurality of switches disposed adjacent to the access opening of said case for actuation when said case is opened and including additional switch means disposed adjacent to said handle, said additional switch means and said switches being respectively actuatable for actuating said igniter means.

This claim refers to both an automatic switch (the aforementioned depressed plungers) and a manual switch (the self-destruct button.) The claim uses the "said switch means" phrase when describing the automatic switch, but then explicitly calls the self-destruct button an *additional* switch means" (emphasis added). The claims consistently suggest this dichotomy—that "switch means" refers only

to the automatic switches while the manual switches are something different.[8]

Mr. Westcott offers his own interpretation of Claim 9. He states that the plurality of switches disposed adjacent to the case opening includes all of the self-destruct button, the handle switch and the depressed plungers. This position is unsupportable. The "additional switch means" clearly refers to the self-destruct button, and the "plurality of switches disposed adjacent to the access opening" clearly refers to the depressed plungers. Claim 9 refers to Claim 7, which in turn refers to Claim 5. Claim 5, as noted earlier, describes the handle switch. Therefore, all three types of switches were identified individually in the chain of dependent claims. Plaintiff's interpretation would lead to redundancy. For example, the handle switch would be claimed in both Claims 5 and 9. The self-destruct button would be claimed twice in Claim 9 alone. The court is not willing to believe that this is a correct interpretation of the patent in light of the sensible alternative interpretation outlined above.

■ As a last, separate argument regarding claim language, plaintiff also asserts that "actuatable" only implies that the switch is capable of being activated, not that it must automatically activate. Accordingly, plaintiff argues that "switch means" covers both the manual and automatic switches. This argument, however, would render the "upon a change in the physical condition of said closure" language of element (d) superfluous. Element (d) does not simply read "actuatable switch means on said closure" or "switch means on said closure which is actuatable." When a patent contains clear structural limitations, the public has a right to rely on those limits in conducting its activities. *Sage Prods., Inc. v. Devon Indus., Inc.*, 126 F.3d 1420, 1425 (Fed.Cir.1997). It is not within the court's discretion to ignore claim language, *see id.* at 1425–26, and the "upon a change" language must be given proper consideration, *see also Senmed, Inc. v. Richard–Allan Med. Indus., Inc.*, 888 F.2d 815, 819 n.

---

8. Note also that Claims 15 and 18 detail, respectively, the mercury gravity switches and conductive strips at the junction of the body portion rims. These are both automatic switches, and, in keeping with the established pattern of the claim wording, Claims 15 and 18 both employ the "said switch means" language.

8 (Fed.Cir.1989) (patentee may not proffer interpretation for purposes of litigation that would alter the indisputable public record consisting of the claims, the specification and the prosecution history, and "treat the claims as a 'nose of wax.'") As detailed above, proper examination of Claim 1 leads to the conclusion that "switch means" does not include manually-activated switches.[9]

### b. Specification

Turning now to the specification of the '463 patent, plaintiff asserts that the Summary of the Invention section specifically defines the switch means to include manually activated switches. Mr. Westcott quotes the following text beginning at column 1, line 64 of the patent:

> Among the various switch means are the electrically conducting inner and outer coverings of the body portion and the lid, which, if a knife is inserted therethrough, will close the circuit to set off the igniters. Furthermore, the rim of the closure is provided with contact strips which, if shorted, will close the circuit to set off the thermite. Still another switch arrangement includes a mercury switch which, when tilted will close the circuitry to set off the thermite. Still another switch is included in the handle, the switch being normally closed but opened when the handle is grasped and will close if the grasp of the person carrying it is released. A switch is also disposed close to the handle for manual actuation in the event that the contents are threatened. Still another switch means is closed when the case is opened.

This text, according to the plaintiff, demonstrates that "[w]ith the two manually actuatable switches straddled between the other, non-direct manually operable switches ... clearly there was no intent to exclude them from the meaning of the term 'switch means....'"

A second section of the specification which the plaintiff cites is at column 6, lines 34–35. There, the patent states that the various switch means are "actuated by a physical charge [sic] in the case." Plaintiff claims that "[i]mmediately following this general description of the switches, the patent specifically discusses the various switch means contemplated by the expression 'a physical change in the case.'"

While the plaintiff may impart great significance to these passages in support of his position, the court does not agree. In the second section which plaintiff cites, the discussion of the switches is in a different paragraph from the general description. There is no clear connection between the two apart from the fact that both discuss the circuitry pattern in the tamper-proof case. As defendant notes, plaintiff's argument "seems to be based on the ... proposition that if the locations of the descriptions of the various switches in the specification are physically close [on the page] then the switches must be the same." More to the point, the cited text gives no clear indication that "switch means" must include manual switches.

The first cited section (from the Summary of the Invention) does list each of the switch types as plaintiff notes. However, the court disagrees with the plaintiff as to the import of this part of the specification. According to the plaintiff, this language demonstrates that

---

9. The court notes that, as a result of its construction of the element (d) switch means language, there is no need for the court to decide whether element (d) is framed in "means-plus-function" form. Under 35 U.S.C. § 112 ¶ 6,

> [a]n element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

It is plaintiff's position that element (d) recites no function and is merely an element. Defendant counters that "actuatable upon a change in the physical condition of said closure" imparts a function to the switch means which must then be ascertained from the specification. However, by placing great emphasis on the "actuatable upon a change in the physical condition of said closure" language in interpreting "switch means," the court finds that its interpretation of "switch means" solely using the language of the claims is consistent with the meaning which it could have understood from the specification alone. *See* Section B.1.b., *infra.* Either analysis would have led to the same conclusion, so the means-plus-function issue becomes moot.

"there was no intent to exclude [the manual switches] from the meaning of the term 'switch means....'" While this may be true, the court finds it critical that the language also demonstrates no intent to include the manual switches. Again, the specification fails to provide an obvious answer.

▬ When the meaning of a claim term is disputed, the specification is considered to determine whether the patentee acted as his own lexicographer and ascribed a certain meaning to the term. *Digital Biometrics, Inc. v. Identix, Inc.*, 149 F.3d 1335, 1344 (Fed.Cir.1998). If he did not, the ordinary meaning of the claim language controls. *Id.* Plaintiff's cited specification passages have not persuaded the court that he meant to clearly assign any particular unusual meaning to "switch means." As discussed *supra* in Section B.1.a. of this opinion, the court's reading of the claims and their ordinary meaning indicates that "switch means" includes only the automatic switches. While the claims should be interpreted in light of the specification, all that appears in the specification is not necessarily within the scope of the claims and entitled to protection. *See Novo Nordisk of N. Am., Inc. v. Genentech, Inc.*, 77 F.3d 1364, 1369 (Fed.Cir.1996).

c. Prosecution history

The final consideration in claim construction, and the one which the court finds dispositive in this case, is the prosecution history of the '463 patent. The documents submitted by the parties concerning the prosecution of the '463 patent show that it was filed on May 14, 1979. The Examiner subsequently mailed a Notice of Allowance on February 9, 1980, apparently allowing the application for patent without requiring Mr. Westcott to amend his specification or claims in any way. The Notice of Allowance, however, did have an attached sheet of references to prior patents. The Notice stated that "[t]he listed references are considered to be pertinent to the claimed invention, but the claims are deemed patentable thereover." Among those references to prior art patents was a citation to U.S. Patent No. 3,650,226 (the '226 patent) to Conroy et al. for a "Document Destruct File."

The '226 patent issued on March 21, 1972. For reference, Figures 1, 4 and 7 from the patent are reproduced below with bracketed identification numbers provided by the court. To summarize, it details a multiple drawer security file cabinet [10]. The drawers [12, 13, 14 and 15] are mounted in the cabinet [10] to slide in and out like a standard filing cabinet. Oxidizing panels [76] with igniters [83] are wired to a triggering circuit and several are located in each drawer [12, 13, 14 and 15] for destruction of the file contents. There is a flue space behind the drawers which allows exhaust to travel from the drawers down to the cabinet bottom. Exhaust then passes through a pool of water before exiting the cabinet through a grated flue opening [62] in the bottom front of the cabinet. Destruction is accomplished by pulling a firing trigger [110]. The trigger [110] irreversibly sets off a time-delay fuse that activates a thermal battery after a predetermined delay (typically two minutes.) A lock mechanism [88] can (1) prevent a locking switch [97] on the inside of one drawer [13] from closing the circuit which connects the battery to the panel igniters [83], and (2) prevent the opening and closing of the drawers [12, 13, 14 and 15].

Fig. 1

Fig. 7

*Fig. 4*

Comparing the '226 document destruct cabinet to plaintiff's tamper-proof case, it is apparent that both devices have several pairs of functionally equivalent elements. These pairs include:

1. the element (a) closure of the '463 patent and the cabinet of the '226 patent;

2. the element (b) liner of '463 and the inner drawers of '226;

3. the element (c) pyrotechnic charge of '463 and the oxidizing panels of '226;

4. the element (e) igniter means of '463 and the panel igniters of '226; and

5. the element (f) current source of '463 and the thermal battery of '226.

Element (g) of the '463 patent—the control means which renders the switch means actuatable or nonactuatable—finds its parallel in the lock mechanism [88] of '226. That lock mechanism prevents or enables the movement of a bolt [91], which in turn moves a switch [97] to close or open the battery/igniter circuit. The lock [88] also prevents or enables opening of the drawers.

This leaves just one unconsidered element from Claim 1 of the '463 patent, the element (d) switch means. The court has identified three structures in the '226 patent which deserve analysis as possible parallels to the '463 switch means. These are the (1) locking switch [97] on the inside of one draw-

er, (2) switches at the rear of the drawers and (3) the trigger [110]. While it is possible that no single one of these is prior art bearing on the meaning of the '463 switch means, the court rejects this proposition. Each of the possible parallel structures can act to enable the destruction of the '226 cabinet contents by affecting the circuit which contains the battery and igniters. As explained below, they all can serve operationally in the same manner or for the same purpose as the switch means if the switch means is defined to include manually activated switches.

The first structure, the locking switch, is mounted on the inside front of the drawer which supports the locking mechanism. This locking switch will close the circuit between the battery and the igniters when it is moved into place by a bolt. The bolt moves the switch when an operator closes the drawer and rotates a handle [71]. The second structure is a set of rear switches. These switches are located on the back panels of the sliding drawers; they close the battery/igniter circuit when an operator fully closes all the drawers. It is clear that both the locking switch and the rear switches must be manually activated. They will not move out of their open or closed positions without some action by the operator.

The plaintiff argues that these first two structures operate differently than the '463 switch means. He apparently sees a distinction because closure of these '226 switches will not necessarily result in immediate destruction. As noted earlier, the thermal battery is not active unless the firing trigger is pulled to set off the battery fuse. Destruction of the '226 cabinet contents will not ensue unless the trigger has been pulled prior to door closure and handle rotation. The court does not find plaintiff's argument persuasive. Pressing the self-destruct button or releasing the handle switch on the '463 device also will not necessarily result in destruction. The circuit may still be open at another point because the '463 key selector switch must have been previously set to the

appropriate position. Thus, the '226 firing trigger, like the '226 lock mechanism, can easily be seen as another "control means."

The third structure which could parallel the '463 switch means is the trigger itself. In order to activate the battery, the operator must open the drawer and pull the firing trigger. In this situation, it is again clear that the switch/trigger requires manual activation by the operator. The locking mechanism acts as a "control means" by preventing or allowing the necessary first step of opening the drawer prior to pulling the trigger.

The full significance of the prior analysis can now be seen. As indicated above, Claim 1 of the '463 patent, the independent claim at issue in this case, grants protection to the plaintiff for the combination of six elements and a switch means. Meanwhile, the '226 patent has been shown to demonstrate components which correspond to each of the said six elements. Additionally, the court has determined that there are three manually activated structures in the '226 cabinet which have an equivalent function and operate in the same manner as the "switch means" of plaintiff's '463 patent. As the '226 patent issued more than eight years prior to the '463 patent, the Examiner had to, and did, consider the '226 patent to be relevant prior art when he decided whether to grant Mr. Westcott a patent. It is clear that the Examiner would not have granted the '463 patent if he had thought that the '463 "switch means" included manually activated switches. If that were the case, the '463 invention would have already been "patented ... before the invention thereof by the applicant ..." in violation of 35 U.S.C. § 102(a) (1994).[10]

Since the Examiner granted the '463 patent after considering the '226 patent and its manually activated switches, this court can only conclude that the Examiner was granting protection for automatic switch means only. This is not inconsistent with any evidence from the '463 specification, and it is

---

10. The text of 35 U.S.C. § 102(a) reads:

 **102. Conditions for patentability; novelty and loss of right to patent**
 A person shall be entitled to a patent unless-

 (a) the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent, ...

entirely consistent with the court's interpretation of Claim 1 based on the ordinary meaning of that claim's language and the language of the other '463 claims.

### 2. Comparison of claims to allegedly infringing device

Having construed Claim 1 of the '463 patent, the infringement analysis now requires comparison of that claim to the allegedly infringing devices. The law currently recognizes two types of infringement: (1) literal infringement and (2) infringement under a theory known as the "doctrine of equivalents." *See Warner–Jenkinson Co., Inc. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 117 S.Ct. 1040, 1045, 137 L.Ed.2d 146 (1997). The court considers each in turn.

### a. Literal infringement

 Mr. Westcott alleges that his '463 patent for a tamper-proof case is infringed by the Navy's use of the MDDC and SDDC document destruction systems. To prove literal infringement, the patentee must show that the accused device or devices contain every element and limitation of the asserted claims. *See Mas–Hamilton v. LaGard, Inc.*, 156 F.3d at 1210–11. There is no infringement if even one element or limitation is missing or not met as claimed. *See id.* While an infringement analysis usually involves both issues of law and questions of fact, summary judgment may still be proper. *Phonometrics, Inc. v. Northern Telecom Inc.*, 133 F.3d 1459, 1463 (Fed.Cir.1998).

 Having construed the element (d) switch means of the '463 patent to include only automatic switches, the court can easily dispose of the literal infringement claim. The MDDC and SDDC clearly contain no automatic switches of the type disclosed in the '463 patent. The parties have stipulated that neither the MDDC nor the SDDC has an electrical switch that operates the ignition circuit in response to any of (1) opening the safe door, (2) attempting to pry open the safe door, (3) tilting the safe or (4) piercing the

safe's exterior. Neither device contains a switch means as recited in Claim 1 of the '463 patent. Additionally, since the element (g) control means is defined to control actuation of the switch means, the parties agree that there can be no control means if there is no switch means. With the complete absence of at least two claim elements in the MDDC and SDDC, the court concludes that there is no literal infringement of Claim 1.[11] Furthermore, a dependent claim cannot be infringed unless the independent claim on which it is based is infringed. *See* 35 U.S.C. § 112 ¶ 4; *Teledyne McCormick Selph v. United States*, 214 Ct.Cl. 672, 558 F.2d 1000, 1004 (1977) Thus, there is also no literal infringement of the other claim at issue, Claim 10.

### b. Infringement under the doctrine of equivalents

 In the absence of literal infringement, the court must still determine whether plaintiff's patent has been infringed by the MDDC or SDDC under what is known in patent law as the "doctrine of equivalents." *See Warner–Jenkinson v. Hilton Davis Chem. Co.*, 520 U.S. 17, 117 S.Ct. at 1045. "Under this doctrine, a product or process that does not literally infringe upon the express terms of a patent claim may nonetheless be found to infringe if there is 'equivalence' between the elements of the accused product or process and the claimed elements of the patented invention." *Id.* (citing *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*, 339 U.S. 605, 609, 70 S.Ct. 854, 94 L.Ed. 1097 (1950)). Since every element in a patent claim is material to defining an invention's scope, the Supreme Court has declared that the doctrine must be applied to individual elements of the claim and not to the invention as a whole. *See id.*, 520 U.S. 17, 117 S.Ct. at 1049. Thus, to establish infringement under this doctrine, the accused device must be shown to have an equivalent for each literally absent claim element. *Dawn Equip.*

---

11. It appears from defendant's briefs and the oral argument that defendant also asserts a lack of the element (b) liner in Claim 1 of the '463 patent. This is not a question of law involving the scope of Claim 1, but rather a question of fact as to the equivalence of an element. This issue is inappropriate for summary judgment and the court will not address it here.

*Co. v. Kentucky Farms Inc.,* 140 F.3d 1009, 1015 (Fed.Cir.1998).

■ In order to have "equivalence," an element of an accused device must differ only insubstantially from the patented element. *Digital Biometrics v. Identix, Inc.,* 149 F.3d at 1349. One way to determine if substantial differences exist is to apply the function-way-result test. *See Warner–Jenkinson v. Hilton Davis Chem. Co.,* 520 U.S. 17, 117 S.Ct. at 1054; *Mas–Hamilton v. LaGard, Inc.,* 156 F.3d at 1210–11. Under the function-way-result test, there is equivalence of elements if they perform substantially the same function, in substantially the same way, to achieve substantially the same result. *Dawn Equip. v. Kentucky Farms, Inc.,* 140 F.3d at 1015. In an appropriate case, summary judgment is available as the decisional mechanism for making the equivalence determination. *Digital Biometrics v. Identix, Inc.,* 149 F.3d at 1349. The Supreme Court has clarified that "[w]here the evidence is such that no reasonable jury could determine two elements to be equivalent, district courts are obliged to grant partial or complete summary judgment." *Warner–Jenkinson v. Hilton Davis Chem. Co.,* 520 U.S. 17, 117 S.Ct. at 1053 n. 8.

■ As the element (d) switch means of the '463 patent has been construed to include only automatic switches, application of the insubstantial differences test is straightforward and leads to a clear determination in this case. The allegedly equivalent structure in defendant's MDDC and SDDC can only be the firing handle which pulls the fuse to activate the thermal battery. Looking at the function-way-result test components, the firing handle achieves substantially the same result as the '463 switch means because they both result in destruction of contents. For the second prong of the test, it is debatable whether they have substantially the same function. The court is of the opinion that the firing handle functions to activate the battery while the switch means functions to close a circuit. Regardless, the court need not answer that question conclusively because the

fact that both elements do not perform substantially in the same way is determinative here. Quite simply, the firing handle requires manual activation, while the switch means (as the court has construed it) moves automatically upon the occurrence of specific events. The former requires deliberate activation by an individual with the intent to destroy any contents, while the latter does not. A reasonable jury could not see this as an insubstantial difference under the doctrine of equivalents. The real advance in the art which the '463 patent disclosed was a new method for automatic protective destruction of documents not requiring the owner's presence. It was not owner-initiated manual destruction.

The court notes that the Navy's MDDC and SDDC present nothing novel in comparison to the '226 patent discussed earlier. Thus, the Navy's use of the MDDC and SDDC is mere practice of prior art which, because it issued more than seventeen years ago, is now in the public domain.[12] Therefore, as the defendant notes, the plaintiff is "impaled on the horns of a dilemma." If the plaintiff were to succeed on his claim of equivalency, then the '463 patent, like the MDDC and SDDC, must also be practicing that which is in the public domain. This would render the '463 patent invalid since its date of issue, December 2, 1980, was less than seventeen years after issuance of the '226 patent.

A claim is to be construed in a way to preserve its validity, but cannot be rewritten. *Texas Instruments, Inc. v. United States Int'l Trade Comm'n,* 871 F.2d at 1065. The court has remained faithful to this principal while preserving Mr. Westcott's right to protection for what was actually inventive in the '463 patent. However, as the MDDC and SDDC do not literally infringe plaintiff's '463 patent and have no elements equivalent to the '463 switch means, the court must enter an appropriate summary judgment of noninfringement.

---

12. Since the '226 patent was granted in 1972, its statutory period of protection was 17 years from the date of issue. *See* 35 U.S.C. § 154 (1970).

The patent would have entered the public domain on March 21, 1989.

## C. Attorney's fees and sanctions

Plaintiff has requested an award of attorney's fees under 35 U.S.C. § 285 (1994). The requirements for such an award are that "(1) the case must be exceptional, (2) the ... court may exercise its discretion, (3) the fees must be reasonable, and (4) the fees may be awarded only to the prevailing party." *Gentry Gallery, Inc. v. Berkline Corp.,* 134 F.3d 1473, 1480 (Fed.Cir.1998) (quoting *Machinery Corp. of Am. v. Gullfiber AB,* 774 F.2d 467, 470 (Fed.Cir.1985)). As the court has found against plaintiff here, at least the fourth requirement of Section 285 has not been met and plaintiff is not entitled to an award of attorney's fees.

Defendant, in turn, has requested the imposition of sanctions against plaintiff. As plaintiff has presented a colorable argument not wholly lacking in substance, the court finds that no sanctions are appropriate in this case.

## *CONCLUSION*

For the foregoing reasons, defendant's cross-motion for summary judgment of non-infringement is **GRANTED** and plaintiff's cross-motion for summary judgment of infringement is **DENIED.**

**IT IS SO ORDERED**