ROMAG FASTENERS, INC., Plaintiff,

v.

MITZI INTERNATIONAL HANDBAG
AND ACCESSORIES, LTD.,
Defendant.

No. 01 Civ. 1898(LAK).

United States District Court,
S.D. New York.

June 10, 2004.

Order Modifying Order June 22, 2004.

Norman H. Zivin, Wendy Ellen Miller, Cooper & Dunham, L.L.P., New York, NY, for Plaintiff.

Mark S. Sullivan, Dorsey & Whitney, L.L.P., New York, NY, for Defendant.

## ORDER

KAPLAN, District Judge.

Defendant's motion for summary judgment dismissing the complaint is granted to the extent that the claim of infringement of Claim 3 of U.S. Patent No. 5,722,-126 is dismissed and denied in all other respects, substantially for the reasons set forth in the report and recommendation of Magistrate Judge Frank Maas. The parties' objections are overruled.

SO ORDERED.

## ORDER ON MOTION FOR CLARIFICATION

Plaintiff's motion for clarification is granted on consent. The order dated June 10, 2004 is modified to provide that defendant's motion for summary judgment dismissing the complaint is granted to the extent that the claim of infringement of Claim 8 of U.S. Patent No. 5,933,926 is dismissed and denied in all other respects, substantially for the reasons set forth in the report and recommendation of Magistrate Judge Frank Maas. The parties' objections are overruled.

SO ORDERED.

## *REPORT AND RECOMMENDATION TO THE HONORABLE LEWIS A. KAPLAN*

MAAS, United States Magistrate Judge.

### I. *Introduction*

In this patent infringement suit, plaintiff Romag Fasteners, Inc. ("Romag") contends that defendant Mitzi International Handbag and Accessories, Ltd. ("Mitzi") has infringed two patents for magnetic snap fasteners which are owned by Romag (together, the "Romag Patents"). The two patents are U.S. Patent No. 5,722,126 (" '126 Patent"), which was filed on May 22, 1996, and issued by the United States Patent Office on March 3, 1998, and U.S. Patent No. 5,933,926 (" '926 Patent"), which was filed on January 26, 1998, as a continuation of the application that ultimately issued as the '126 Patent.

Both Romag Patents disclose and claim an invention which consists of a female section containing a magnet and a male section which aligns with the female section to close the fastener. The male section, which is the only one at issue in this case, consists of three components: a base washer, attachment legs which connect the section to the handbag, and a tubular stem which is used to connect the washer to the legs. In his applications for the Romag Patents, the named inventor, Romag's president, Howard J. Reiter, contended that his invention represents an improvement over prior art because it utilizes a hollow tubular stem which facilitates assembly and allows the snap fasteners to be plated more effectively.

The Romag Patents each contain several claims. Mitzi has now moved for summary judgment with respect to Claim 3 of the '126 Patent ("Claim 3") and Claim 8 of the '926 Patent ("Claim 8"), both of which are independent claims. The parties agree that if summary judgment is granted with respect to these claims, Mitzi will be entitled to the dismissal of Romag's complaint in its entirety.

For the reasons set forth below, Mitzi's motion should be denied with respect to Claim 3 and granted with respect to Claim 8.

### II. *Background*

Romag is a Connecticut corporation owned by a family which has been in the snap fastener business since 1912. (Decl. of Howard J. Reiter, dated Sept. 5, 2003 ("Reiter Decl."), ¶ 2; Mitzi R. 56.1 Stmt. ¶ 3).[1] Howard J. Reiter is Romag's president and the named inventor of the devices disclosed and claimed in the Romag Patents. (Reiter Decl. ¶ 1).

Mitzi is a New York corporation, with a place of business in Manhattan, which is in the business of selling handbags and related accessories, including handbags with

---

1. In its Statement of Disputed Facts (Docket No. 38), Romag has not taken issue with any of the factual statements in Mitzi's Statement of Undisputed Facts (Docket No. 34) cited in this Report and Recommendation.

magnetic snap fasteners. (Mitzi R. 56.1 Stmt. ¶¶ 5–6). Mitzi does not manufacture the products it sells. (*See id.* ¶¶ 56–57, 59–60).

In 1998, after reviewing an advertisement in a trade publication, Mitzi requested information regarding Romag's magnetic snap fasteners. (Reiter Decl. ¶ 7). In response, Romag sent Mitzi a copy of the '126 Patent and several samples of its products.[2] (*Id.* & Ex. B). Romag also suggested that Mitzi contact Romag's Hong Kong licensee if it wished to obtain further information or place an order. (*Id.*).

Rather than purchasing any Romag fasteners, Mitzi contracted with several different manufacturers to produce magnetic snap fasteners for its line of handbags. (*See* Decl. of Bonnie Cheung, dated July 31, 2003 ("Cheung Decl."), ¶¶ 3–4).[3] In September 2000, Romag learned that these fasteners were being used in handbags that Mitzi was selling to K–Mart and Bradlees. (Reiter Decl. ¶ 8). This lawsuit was filed approximately six months later.

Romag alleges that Mitzi's magnetic snap closures infringe Claim 3 of the '126 Patent and Claims 8–10 of the '926 Patent. (*See* Compl. ¶¶ 12–14). Only the male component of the accused devices is alleged to infringe the Romag Patents. (*See* Romag Mem. of L. at 5). Additionally, the parties agree that claims 9 and 10 of the '926 Patent are dependent claims which can be infringed only if Claim 8 is infringed. (*Id.*).

Prior to Mr. Reiter's application for the '126 Patent, other patents for magnetic snap fasteners had been issued to other inventors. (*See* Decl. of Mark S. Sullivan, Esq., dated Aug. 5, 2003 ("Sullivan Decl."), Exs. A at 1, E–G; Mitzi R. 56.1 Stmt. ¶¶ 25, 27–31). Several of these patents are similar to the Romag Patents in that they disclose and claim a fastener consisting of male and female sections, each of which contains a base plate to which attachment legs are attached. (*Id.*). (The attachment legs are the means by which the sections of the snap are attached to a handbag or other product.) Like the Romag Patents, these prior patents also disclose and claim a female section which contains a magnet sandwiched between the base plate and a cover. (*Id.*).

Romag contends that the Romag Patents were not anticipated by prior art because the attachment legs on the Romag devices, unlike those disclosed and claimed in the earlier patents, can be rotated. (*See, e.g.,* Romag Mem. of L. at 20).

Claim 3 of the '126 Patent reads:

3. A male section of a magnetic snap fastener for releasably connecting a first surface to which the male section of the magnetic snap fastener is attached and a second surface to which a female section of the magnetic snap fastener is attached, comprising:

a base washer defining a first hole substantially in the center of the base washer;

a tubular stem with a second hole therethrough and substantially in the center thereof, the tubular stem extending through the first hole, whereby the first and second holes are substantially axially aligned; and

---

**2.** The '926 Patent had not been issued when Romag responded to Mitzi's inquiry.

**3.** Among the exhibits that Mitzi has submitted in support of its motion is a CD–ROM con-

taining a video clip which shows how its snap fasteners are made. (*See* Decl. of Louie Tam, dated July 31, 2003, ¶ 4 & Ex. A)

attachment means affixed to the base washer by the tubular stem and adapted for attachment to the first surface;

whereby insertion of the tubular stem into the female section of the magnetic snap fastener creates a magnetic force which releasably connects the male and female sections and hence the first surface attached to the attachment means and the second surface attached to the female section of the magnetic snap fastener;

wherein the attachment means comprises a pair of legs;

wherein the pair of legs is mounted to the base washer by the tubular stem; and

*wherein the pair of legs is rotatable with respect to the base washer.*

(Sullivan Decl. Ex. A ('126 Patent), col. 8, ll. 20–45) (emphasis added).

Claim 8 of the '926 Patent reads:

8. A male section of a magnetic snap fastener for releasably connecting a first surface to which the male section of the magnetic snap fastener is attached and a second surface to which a female section of the magnetic snap fastener is attached, comprising:

a base washer defining a first hole substantially in the center of the base washer;

a tubular stem with a second hole therethrough and substantially in the center thereof, the tubular stem extending through the first hole, whereby the first and second holes are substantially axially aligned; and

attachment means *non-rigidly connected* to the base washer by the tubular stem *so that the attachment means may rotate with respect to the base washer the* attachment means being adapted for attachment to the first surface;

whereby bringing the tubular stem into contact with the female section of the magnetic snap fastener creates a magnetic force which releasably connects the male and female sections and hence the first surface attached to the attachment means and the second surface attached to the female section of the magnetic snap fastener.

(*Id.* Ex. B ('926 Patent), col. 8, ll. 17–38) (emphasis added).

Both patents contain a Figure 1b which depicts a cross sectional view of the first embodiment of the claimed invention in the following manner:

FIG. 1b

The disputed male section of the device is shown on the right hand side of the diagram above the number 5. The base washer is marked "21," the attachment legs are marked "23," and the tubular stem is marked "19." The tubular stem has a central hole (marked "19a") which is aligned with a second central hole (marked "21a") in the base washer. (*See id.* Ex. A ('126 Patent) at col. 3, ll. 45–51). The detailed description of the first embodi-

ment indicates that the "attachment legs are preferably not rigidly secured so that they may rotate with respect to the second base washer. This allows coating solutions to reach all surfaces thereby giving greater corrosion protection." (*Id.* ll. 52–56). Similarly, in the original sketch of Figure 1b submitted to the Patent Office, Mr. Reiter inserted a notation that the end of the tubular stem should be rolled against the base washer "so that [the] legs can turn." (*See id.* Ex. D).

## III. *Parties' Contentions*

Mitzi argues that it is entitled to summary judgment because the attachment legs of the accused devices, unlike those of the patented invention, are connected to the base washer using a rivet and, therefore, are neither "rotatable" as required by Claim 3, nor "non-rigidly connected" so that they may "rotate with respect to the base washer" as required by Claim 8. (Mitzi Mem. of L. at 1). Romag counters that there is "no requirement in [the] '126 and '926 Patents that the legs actually rotate, but only that they be *rotatable.*" (Reiter Decl. ¶ 9) (emphasis in original). In that regard, Mr. Reiter alleges that he was able to rotate the attachment legs on several specimens of Mitzi's accused products with his bare hands and those on other specimens using a pliers and a wrench. (*Id.* ¶¶ 8–9). Although Mitzi contends that the legs on its magnetic snaps cannot be rotated without damaging or breaking the rivet, (*See* Cheung Decl. ¶ 6), Romag argues that the rotatability of the attachment legs on Mitzi's snaps presents a factual issue which precludes the granting of summary judgment. (Romag Mem. of L. at 2).

## IV. *Discussion*

### A. *Jurisdiction and Venue*

This Court has jurisdiction over this case pursuant to 28 U.S.C. §§ 1331 and 1338. Pursuant to 28 U.S.C. §§ 1391(b) and 1400(b), venue in this District is proper because Mitzi has a place of business here. (Mitzi R. 56.1 Stmt. ¶ 2).

### B. *Applicable Law*

#### 1. *Summary Judgment*

The summary judgment standard in patent cases does not differ from that routinely applied in other subject matter areas. Accordingly, to prevail on its motion, Mitzi must show that the evidence, viewed in the light most favorable to Romag, does not present a genuine issue of material fact, and that Mitzi is entitled to summary judgment as a matter of law. *R.F. Delaware, Inc. v. Pac. Keystone Techs., Inc.,* 326 F.3d 1255, 1266 (Fed.Cir.2003); *Kegel Co. v. AMF Bowling, Inc.,* 127 F.3d 1420, 1425 (Fed.Cir.1997). Conversely, to oppose summary judgment successfully, Romag "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Romag must set forth specific facts, not mere speculation or conclusory allegations, to demonstrate the existence of a genuine issue of material fact. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248–49, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

#### 2. *Infringement Analysis*

In a patent infringement case, a court must engage in a two-step process to determine whether a party is entitled to summary judgment. *See Renishaw v. Marposs Societa' per Azioni,* 158 F.3d 1243, 1247–48 (Fed.Cir.1998). In the first step, the Court must interpret the patent claims alleged to be infringed to determine their meaning and scope. *Markman v. Westview Instruments, Inc.,* 517 U.S. 370, 384, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996). This process of claim interpretation presents an issue of law for the Court to

decide. *Id.; Bai v. L & L Wings, Inc.*, 160 F.3d 1350, 1353 (Fed.Cir.1998).

■ A patentee may define the terms used in its patent. *See Lear Siegler, Inc. v. Aeroquip Corp.*, 733 F.2d 881, 888 (Fed. Cir.1984). Where the patentee serves as its own lexicographer, the definitions set forth in the patent control. *See Finnigan Corp. v. Int'l Trade Comm'n*, 180 F.3d 1354, 1364 (Fed.Cir.1999). Where the patentee has not defined a term used in a claim, however, it must be presumed to have its ordinary meaning or that which would customarily be known to one with ordinary skill in the art practiced in the patent. *Johnson Worldwide Assocs., Inc. v. Zebco Corp.*, 175 F.3d 985, 989–90 (Fed. Cir.1999); *Nat'l Recovery Techs. v. Magnetic Separation Sys.*, 166 F.3d 1190, 1195 (Fed.Cir.1999). To determine this meaning, courts typically look first to evidence intrinsic to the patent, including the manner in which the term is used in the patent, the drawings, and the patent's prosecution history. *Interactive Gift Express, Inc. v. Compuserve, Inc.*, 256 F.3d 1323, 1331 (Fed.Cir.2001). Extrinsic evidence may also be considered where the intrinsic evidence is ambiguous, but the use of intrinsic evidence alone is strongly preferred because the public is entitled to rely on the published record of the patent to determine its scope. *Bell & Howell Document Mgmt. Prods. Co. v. Altek Sys.*, 132 F.3d 701, 706 (Fed.Cir.1997). Whatever sources are consulted, the claim interpretation ultimately must "accord with the words chosen by the patentee to stake out the boundary of the claimed property." *Renishaw*, 158 F.3d at 1248.

■ Once any disputed terms used in the claim have been interpreted, the second step of the infringement analysis requires the Court to compare the accused product to the allegedly infringed claim. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed.Cir.1995), *aff'd*, 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996). To establish literal infringement, a patent owner must show that every limitation of the patent claim is present as an element of the accused device. *Dawn Equipment Co. v. Kentucky Farms, Inc.*, 140 F.3d 1009, 1014 (Fed.Cir.1998). This presents a question of fact. *Tegal Corp. v. Tokyo Electron Am., Inc.*, 257 F.3d 1331, 1350 (Fed.Cir.2001).

### 3. *Doctrine of Equivalents*

■ Even when the accused device does not contain every element of the patented invention, infringement may still be found under the "doctrine of equivalents" if the differences between the claimed invention and the accused device are "insubstantial." To meet this criterion, the patent holder must establish that with respect to each disputed element the accused product performs "substantially the same function, in substantially the same way, to give substantially the same result." *Hormone Research Found., Inc. v. Genentech, Inc.*, 904 F.2d 1558, 1564 (Fed.Cir.1990); *accord Overhead Door Corp. v. Chamberlain Group, Inc.*, 194 F.3d 1261, 1269–70 (Fed. Cir.1999).

[9] The doctrine of equivalents may not be used, however, to recapture ground which was ceded when a patent applicant narrowed its claims in order to secure a patent over prior art. Instead, "prosecution history estoppel" precludes a patentee from obtaining coverage under the doctrine of equivalents of subject matter that previously was relinquished during the prosecution of its patent application. *Festo v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S.722, 734, 122 S.Ct. 1831, 152 L.Ed.2d 944 (2002). In this manner, "[p]rosecution history estoppel ensures that the doctrine of equivalents remains tied to its underlying purpose." *Id.* at 734, 122 S.Ct. 1831.

## C. *Claim Interpretation*

### 1. *Claim 3—"Rotatable" Legs*

The first disputed limitation in Claim 3 of the '126 Patent specifies that the pair of attachment legs is "rotatable with respect to the base washer." ('126 Patent col. 8, ll. 44–45). The term "rotatable" is not defined in the patent. Accordingly, the Court must interpret this contested term. In its papers, Mitzi contends that the "plain and ordinary meaning of this claim limitation is that the legs must be *free* to rotate with respect to the base washer." (Mitzi Mem. of L. at 9) (emphasis added). Mitzi argues that this interpretation is consistent with the plain meaning of the term, the written description of the patent, the drawings contained therein, and the patent's prosecution history. (*Id.* at 9–12). Romag disagrees, arguing that the term "rotatable" does not mean "free to rotate," but, rather, "able to rotate." (Romag Mem. of L. at 6).

Webster's New International Dictionary defines "rotatable" to mean "capable of being rotated." Webster's New Int'l Dictionary 1976 (3d ed.1993). Similarly, the Oxford English Dictionary defines the term to mean "capable of being rotated; admitting of rotation or rotary movement." 14 Oxford English Dictionary 123 (2d ed.1989). Both of these definitions, however, fail to address the amount of torque necessary for the attachment legs to be considered "rotatable" within the meaning of Claim 3.

In these circumstances, it is appropriate to look to the patent and its prosecution history for further guidance. As noted above, in his original application for the '126 Patent, Mr. Reiter inserted a notation on Figure 1b which indicated that the tubular stem attaching the base washer to the legs should be "roll[ed] so that the legs can turn." (*See* Sullivan Decl. Ex. D).

Following this submission, on March 27, 1997, the Patent Office examiner rejected the application for what eventually became the '126 Patent as obvious over U.S. Patent No. 5,572,773 issued to Irving Bauer (the "Bauer Patent") and Japanese Patent No. 8–78230 issued to Morita (the "Morita '230 Patent"). (*See* Mitzi R. 56.1 Stmt. ¶ 21). In a declaration prepared only a few weeks later, Mr. Reiter stated that he had reduced his invention to practice prior to February 15, 1995. (Sullivan Decl. Ex. D (Decl. of Howard J. Reiter, under 37 C.F.R. 1.131, dated Apr.11, 1997, ¶ 4)). On the basis of that declaration, Mr. Reiter argued that the Bauer Patent did not constitute prior art. (*Id.* (Communication in Response to Office Action, dated Apr. 15, 1997, at 2–3)).

In a subsequent amendment of his application, dated September 11, 1997, Mr. Reiter dropped all of his pending patent claims other than Claims 4, 17 and 23, which were renumbered as Claims 1 through 3. In the amendment, Mr. Reiter further suggested that the three claims that he was pursuing were not obvious over the Bauer Patent in view of the Morita '230 Patent because his invention antedated the Morita '230 Patent, which was first published in 1996. Mr. Reiter further distinguished his invention from the prior art by noting that:

> [T]here is no indication that the legs of the Morita 230 device rotate as presently claimed. Each of the leg assemblies in Morita likely are mounted in a stationary relationship relative to the respective male and female member. That Morita uses stationary legs rigidly secured is also shown in Morita's Patent No. 4,453,294 [ (the "Morita '294 Patent") ].

(Sullivan Decl. Ex. D). The specification of the Morita '294 Patent, to which Mr. Reiter referred, states that "locking mem-

bers 5 and 15 [*i.e.*, the attachment legs] are fixed outwardly of not-opposed ends of the plates ... by means of rivets ...." (Sullivan Decl. Ex. F (Morita '294 Patent), col. 3, ll. 23-26).

Following this amendment, the patent examiner allowed the '126 Patent to issue, observing, insofar as pertinent, that "[u]pon further review the limitations in the claims directed to the rotatable legs ... define patentably distinct subject matter to that claimed by Bauer ...." (Sullivan Decl. Ex. D (Response to Amendment dated Oct. 6, 1997)).

Romag contends that the Morita '230 Patent and the Bauer Patent are not prior art and, consequently, cannot be used to limit the scope of the '126 Patent claims. (Romag Mem. of L. at 9). The public, however, is entitled to rely on the statements made by a patent applicant during the prosecution of a patent in determining whether a prospective future device infringes the patent's claims. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583, (Fed.Cir.1996) ("The claims, specification, and file history ... constitute the public record of the patentee's claim, a record on which the public is entitled to rely."). If Mr. Reiter's disclaimer of prior art containing "stationary legs rigidly secured" was unnecessary to the successful prosecution of the '126 Patent, as he now contends, he should have clarified the record before the '126 Patent issued. *See Springs Window Fashions LP v. Novo Industries, LP*, 323 F.3d 989, 995 (Fed.Cir. 2003) ("If the applicant mistakenly disclaimed coverage of the claimed invention, then the applicant should have amended the file to reflect the error, as the applicant is the party in the best position to do so."). Having failed to do so, Mr. Reiter (and therefore Romag) cannot now seek to claim subject matter which he previously abandoned.

Stated somewhat differently, Romag cannot argue infringement of Claim 3 on the basis of attachment legs which are rigidly secured to the base washer by a rivet if those legs are incapable of being rotated and not rigidly secured to the base washer. Conversely, attachment legs are "rotatable" within the meaning of Claim 3 if they are "capable" of being rotated. Precisely what this means becomes more clear when one considers the limitations of Claim 8 of the '926 Patent.

### 2. *Claim 8—Attachment Means "Non–Rigidly Attached" Which May "Rotate"*

Claim 8 of the '926 Patent is similar, but not identical, to Claim 3 of the '126 Patent. Insofar as relevant, Claim 8 contains a limitation requiring that the "attachment means [be] non-rigidly connected to the base washer by the tubular stem so that the attachment means may rotate with respect to the base washer." ('126 Patent, col. 8, ll. 28–30).

In its moving papers, Mitzi notes that the McGraw–Hill Dictionary of Scientific and Technical Terms defines "rigid" as the "quality or state of resisting change in form." (Mitzi Mem. of L. at 13) (quoting McGraw–Hill Dictionary of Scientific and Technical Terms (5th ed.1994)). Based upon this definition, Mitzi contends that the phrase "non-rigidly connected" refers to a connection which "does not offer resistance to the application of a torque," *i.e.*, one in which the attachment legs "rotate freely with respect to the base washer upon application of a torque." (*Id.*).

Romag does not dispute the applicability of the McGraw–Hill definition. Nevertheless, based on that definition, Romag argues that to be "non-rigidly connected" to the base washer the attachment legs must be rotatable without a "change of form." (Romag Mem. of L. at 10).

The McGraw–Hill definition that both sides seek to apply does not require that a connection be rotatable without a change in form in order to be non-rigid. Instead, the definition simply suggests that the connection must "resist" such a change. This definition is consistent with that found in the Oxford English Dictionary, which defines "rigidly" to mean "[w]ith material stiffness or rigidity." 13 Oxford English Dictionary 938. "Rigidity," in turn, is defined in that dictionary as "the state of being rigid," a term which is itself defined as "stiff, unyielding; not pliant or flexible; firm; [and] hard." *Id.; see also* Am. Heritage Dictionary 1501 (4th ed.2000) (defining rigid as "[n]ot flexible or pliant; stiff").

None of these definitions suggests that the connection between the attachment legs and the base washer must actually undergo a change of form when rotated before the attachment legs can be described as "non-rigidly connected." It follows that attachment legs are "rigidly" connected if they resist rotation and "non-rigidly connected" if they do not resist rotation.

The prosecution history of Claim 8 is consistent with this interpretation. After the original application for the '926 Patent was submitted, the claims examiner rejected many of the claims for which protection was sought on "obviousness" grounds. Insofar as relevant, the claims examiner found that these claims were unpatentable over the Morita '230 Patent in view of the Koehler Patent [French Patent no. 2531156] ("Kohler Patent") and the Bauer Patent in view of the Marchesi Patent [U.S. Patent No. 4,736,494] ("Marchesi Patent"). (Sullivan Decl. Ex. H (June 22 and Dec. 21, 1998, Office Actions)).

Under the statutory obviousness requirement, an invention is not patentable "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103(a). In seeking to distinguish over the Bauer Patent, Mr. Reiter argued that

> the present invention ... is neither shown nor suggested by Bauer because of Bauer's failure to disclose or even suggest a male section of a magnetic snap fastener that has attachment means non-rigidly connected to the remaining parts of the fastener. Therefore, Bauer does not allow for the protection against corrosion that is achieved by the present invention.

(Sullivan Decl. Ex. H (Amendment and Response to Office Action dated March 18, 1999, at 4)).

Similarly, although he agreed that the Kohler Patent "discloses a rivet with a tubular stem," Mr. Reiter sought to distinguish over that patent on the theory that both the Kohler Patent and another patent issued to Ossiani[4] "fail[ed] to disclose or even suggest a male section of a magnetic snap fastener that has attachment means non-rigidly connected to the remaining parts of the fastener." (*Id.* at 5).

Mr. Reiter also sought to distinguish over the Marchesi Patent, stating that

> despite any disclosure by Marchesi relating to the use of an attachment washer, this reference does not cure the failure of Ossiani and Koehler to show or even suggest a male section of a magnetic snap fastener that has attachment means non-rigidly connected to the remaining parts of the fastener. There-

4. This apparently is a reference to U.S. Patent No. 5,042,116 issued to Ossiani for a "magnetic closing button for handbags and the like." (*See* United States Patent and Trademark Office Full–Text and Image Database, *available at* http://patft.uspto.gov).

fore this combination does not allow for the protection against corrosion that is achieved by the present patent.

(*Id.* at 6).

Obviously, a connection which does not resist rotation would facilitate the application of a plating solution to all of the surfaces of the fastener, which is one of the bases on which Mr. Reiter sought to distinguish his invention from prior art. Thus, a definition of "non-rigidly" which requires that the attachment legs not resist movement is consistent with the prosecution history of the '926 Patent.

Claim 8 of the '926 Patent also requires that the connection be configured in such a way that the attachment means "may rotate." This is simply another way of saying that the attachment legs must be "rotatable," *i.e.,* capable of rotation, within the meaning of Claim 3. As stated before, this does not imply that the attachment legs must rotate "freely."

### D. *Literal Infringement*

At the second stage of an infringement analysis, the finder of fact must determine whether the accused device contains elements corresponding to the properly-construed limitations of the disputed claims. Mitzi contends that the male segment of the accused fasteners does not infringe the Romag Patents because the attachment means cannot be rotated. Indeed, it has submitted the declaration of its quality control manager, Mr. Tam, who states that the riveted leg attachments on the accused devices "cannot be rotated without damaging or breaking the rivet." (Tam Decl. ¶ 6). Mitzi also notes that when Mr. Reiter was asked to rotate the attachment legs on one such device at his deposition, he conceded that he could not do so "without

ripping his fingers to shreds." (*See* Sullivan Decl. Ex. I (Reiter Dep.) at 73).

Mr. Reiter also testified at his deposition, however, that "[i]f enough torque is applied to the legs with respect to the base plate, yes, sure, they'll rotate." (*Id.*). As he subsequently explained, although he could not rotate the attachment legs on some of the accused Mitzi devices with his bare hands without cutting his fingers, he was able to rotate them with the assistance of a wrench and pliers "without changing the form of the fastener or the connection between the components." (Reiter Decl. ¶ 9). He further has alleged that "[i]n some cases" he was able to "demonstrate[ ] rotatability simply by turning the legs [of the accused devices] with [his] bare hands." (*Id.* ¶ 8).

Exactly what Mr. Reiter's contention is with respect to the rotatability of the attachment legs on the accused devices is unclear. Obviously, if one loosens the connection between two objects—for example, by twisting two stapled sheets of paper without actually disconnecting them—the *form* of the connection may not have changed because the objects remain joined. Nonetheless, the loosened connection clearly is different than the one which previously existed. In similar fashion, Mr. Reiter may simply be indicating in his declaration that the riveted connection on the accused devices, although somewhat looser once rotated, has not really changed "form" because the rivet remains in place and continues to hold the attachment legs to the base washer. He may, however, also be alleging that one can routinely rotate the attachment legs on Mitzi's devices in a circle parallel to the base washer without deforming the connecting rivet.[5]

---

5. This appears to be different than the direction in which the attachment legs rotate in the first preferred embodiment of the patented invention. (*See* Sullivan Decl. Ex. A ('126 Patent) at Fig. 1b).

Romag argues that the dispute between Messrs. Reiter and Tam as to the rotatability of the attachment legs on the accused Mitzi devices gives rise to a genuine issue of material fact which precludes an award of summary judgment to Mitzi with respect to the two claims at issue in this suit. Because these claims are not identical, each requires separate consideration. I will address Claim 8 first.

### 1. Claim 8

■ Claim 8 contains a limitation which requires the attachment legs to be "non-rigidly connected." To prove literal infringement, Romag must therefore establish that the attachment legs on the accused devices do not resist rotation. *See Dawn Equipment Co.*, 140 F.3d at 1014 ("To infringe a claim, each claim limitation must be present in the accused product, literally or equivalently.").

As part of its motion papers, Mitzi has provided the court with several samples of the magnetic snap fasteners used in its handbags. (*See* Cheung Decl. Exs. A–C). Romag has not suggested that these specimen devices are not representative of the accused devices. Even a cursory examination of the samples establishes that they do not contain attachment legs which can be rotated using only one's hands. Accordingly, even if the attachment legs could be rotated with the assistance of hand tools, no reasonable juror could find that they do not "resist" rotation. It follows that the attachment legs on the accused devices are "rigidly" connected to the base washer. Consequently, as a matter of law, Claim 8 of the '926 Patent is not infringed, and Mitzi is entitled to summary judgment on that claim.

### 2. Claim 3

Turning to Claim 3 of the '126 Patent, to establish literal infringement, Romag must show that the attachment legs on the accused devices are not attached to the base washer by a rivet which renders them "incapable" of being rotated. At his deposition, Mr. Reiter was specifically questioned about this riveted connection:

Q So you indicated that this is, referring to the male section, you indicated that that is a riveted connection and I think my last question was can you tell what type of riveted connection that is or how it is made?

A *Yes, the rivet stem, the pin as we have been calling it, in this case has not been rolled over, but it has been, some people call it swaged, it has been cold deformed to expand the diameter of the shaft so it locks, it traps the legs and the plate between the end, the two ends.*

Q You said it traps or locks the legs?

A Yes, between the head of the pin and the deformed end of the pin.

(Sullivan Decl. Ex. I at 52) (emphasis added).

■ It is settled law in this Circuit that "a party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony." *Hayes v. N.Y.C. Dep't of Corrs.*, 84 F.3d 614, 619 (2d Cir.1996); *accord, Margo v. Weiss*, 213 F.3d 55, 60–61 (2d Cir.2000) (parties cannot defeat summary judgment motion through affidavits recanting earlier testimony, errata sheets submitted long after their depositions were taken, or supplemental answers to interrogatories). On the other hand, summary judgment should not be granted when a later filed affidavit, rather than contradicting the deposition, "creates 'a genuine issue of material fact' by supplying additional information, particularly where the deponent's answers had not been clear or the questions posed to him had not been altogether unambiguous." *United States v. Krieger*, 773

F.Supp. 580, 587 (S.D.N.Y.1991) (citing *Villante v. Dep't of Corrs.*, 786 F.2d 516, 522 (2d Cir.1986); *Tippens v. Celotex Corp.*, 805 F.2d 949, 954 (11th Cir.1986); *Miller v. A.H. Robins Co.*, 766 F.2d 1102, 1104 (7th Cir.1985); and *Bender v. Southland Corp.*, 749 F.2d 1205, 1211 (6th Cir. 1984)).

 In this case, Mr. Reiter testified at his deposition that the rivet on the accused devices locked the attachment legs in place. (Sullivan Decl. Ex. I at 52). He also testified that the legs could be rotated if "enough torque was applied to the legs." (*Id.* at 73). Finally, he testified that he could not rotate the legs manually "without ripping his fingers to shreds." (*Id.*). The last of these statements is susceptible to at least two interpretations. First, it could mean that the attachment legs on the accused devices are attached so securely that they cannot be rotated unless hand tools are used. Second, the statement can be read to mean, as Mr. Reiter now contends, that the attachment legs can be rotated by hand, but that the smooth edge and relatively small size of the base washer make this difficult to do without the assistance of hand tools. (*See* Reiter Decl. ¶ 11). If the jury were to find that the latter interpretation accords with reality, it could conceivably find the attachment legs on the Mitzi devices are "capable" of rotation. Having examined the specimen devices submitted by Mitzi, it frankly seems highly unlikely that a jury would, in fact, reach this conclusion. Nonetheless, because the Court cannot exclude this possibility on the present record, Mitzi's motion for summary judgment with respect to the "rotatable" element of Claim 3 should be denied.[6]

### E. Doctrine of Equivalents

A device which does not literally infringe the claims of a patent may nevertheless subject a party to liability under the doctrine of equivalents. *Hormone Research Found.*, 904 F.2d at 1564. Here, again, the Court must give separate consideration to each disputed claim limitation. *Kahn v. General Motors Corp.*, 135 F.3d 1472, 1478 (Fed.Cir.1998).

In its motion papers, Mitzi contends that the doctrine of equivalents is inapplicable to this case because the prosecution history of both Romag Patents reflects Romag's intention to distinguish over prior art by disclaiming a fastener in which the attachment legs are secured to the base washer by means of a rivet. (*See* Mitzi Mem. of L. at 16–17). Ironically, Romag agrees that the doctrine of equivalents is inapplicable here, but it cites a different reason. In Romag's view, because a leg assembly "either is rotatable or not rotatable," there is "no range of equivalents for rotatability." (*See* Romag Mem. of L. at 18).

Consequently, because both sides agree that the doctrine of equivalents is not a basis upon which Romag can be awarded relief, I have not considered its potential applicability.

### V. Conclusion

For the foregoing reasons, Mitzi's motion for summary judgment should be denied with respect to Claim 3 of the '126 Patent, but granted with respect to Claim 8 of the '926 Patent.

---

**6.** In determining whether the attachment legs on Mitzi's devices are rotatable, the finder of fact will be able to consider Mr. Reiter's prior statements indicating that the claimed invention allows rotational movement of the attachment legs so that the plating solution can "reach all surfaces of the fastener to provide greater protection against corrosion." (*See, e.g.*, Reiter Decl. ¶ 5). Although I doubt that any plating solution could reach the space between the attachment legs and the base washer on the Mitzi devices submitted to the Court, neither side has offered any evidence with regard to this question.

VI. *Notice of Procedure for Filing of Objections to this Report and Recommendation*

The parties are hereby directed that if they have any objections to this Report and Recommendation, they must, within ten (10) days from today, make them in writing, file them with the Clerk of the Court, and send copies to the chambers of the Honorable Lewis A. Kaplan and the chambers of the undersigned, at the United States Courthouse, 500 Pearl Street, New York, New York 10007, and to any opposing parties. *See* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72(b). Any requests for an extension of time for filing objections must be directed to Judge Kaplan. Any failure to file timely objections will result in a waiver of those objections for purposes of appeal. *See Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72(b).

Dated Feb. 2, 2004.